**U. S. INDUSTRIES, INC., a corporation, Appellant,**

v.

**SEMCO MANUFACTURING, INC., a corporation, Appellee.**

**No. 76–1991.**

United States Court of Appeals, Eighth Circuit.

Submitted June 16, 1977.

Decided Aug. 29, 1977.

Rehearing and Rehearing En Banc Denied Sept. 23, 1977.

Robert M. Lucy, St. Louis, Mo. (argued), and Thomas C. Walsh and Michael G. Biggers of Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., filed appendix and briefs, for appellant.

Charles E. Rendlen, Jr., Hannibal, Mo., and Howard F. Sachs, Kansas City, Mo., for appellee.

Before GIBSON, Chief Judge, and HEANEY and ROSS, Circuit Judges.

ROSS, Circuit Judge.

In this contract cause of action, Federal Sheet Metal (hereinafter FSM), a division of U. S. Industries, Inc., sued to recover losses incurred when its supplier, Semco Manufacturing, Inc. (hereinafter Semco), allegedly breached a contract to furnish medium and high pressure ductwork to FSM. The parties are of diverse citizenship[1] and the amount in controversy exceeds $10,000.

In July 1972 FSM was successful in securing a subcontract for the mechanical work on construction of the new Walter Reed

---

1. FSM is incorporated in Delaware and has its principal place of business in New York; Semco is incorporated and has its principal place of business in Missouri.

Army Hospital; FSM was required to furnish and install all components of the plumbing, heating and air conditioning systems. Semco, FSM's supplier, had itself prepared an unsuccessful bid on the high pressure ductwork for this building in 1972, and was familiar with the Walter Reed plans and specifications. The negotiations, discussions, and correspondence in connection with the agreement in this case were carried on primarily between Mr. Lawrence Koenig, president of FSM, and Mr. Donald Moodie, president of Semco, a manufacturer of sheet metal products.

The evidence is conflicting as to whether it was Koenig or Moodie who made the initial contact which began the negotiations; however, it is agreed that discussions did begin in approximately June of 1973 and that Semco submitted its first quotation on July 25, 1973. Separate quotations on Semco quotation forms were given for the ductwork, the insulated fan housings, and the soundtraps.

The Semco quotation of July 25 had the following provision for the proposed *scope of the work,* which is important to the resolution of the issues and particularly to whether or not a contract was formed:

SEMCO proposes to furnish the following materials for the above project, in accordance with the specifications and plans except as set forth herein, and in accordance with the terms and conditions set below and on the back hereof:

1. SCOPE OF MATERIALS INCLUDED: HIGH PRESSURE DUAL DUCT SUPPLY SYSTEM:

All round and oval duct and fittings from the transition at the air handling unit to the mixing boxes but _____ [illegible] including the transition. All duct is single wall, standard gauge galvanized steel. No angle rings are required and flat span angles on the oval are included where required by SEMCO standards. All take off fittings 45° and 90° are conical. Two feet of flexible duct is figured at mixing box.

2. *EXCLUDED FROM ABOVE: Unless specifically included above, the following materials are excluded from this quotation: Square and rectangular to round and/or oval transitions, tape and mastic, fire and other dampers, access sections for dampers, flexible duct and clamps.* Other exclusions: Die stamped elbows at mixing boxes per Spec. Para. 13.3.3.a are not included. Also excluded low pressure, return, exhaust and other ductwork and all ductwork marked future.

(The exclusions italicized above appear to be part of Semco's printed form.) On this quotation a handwritten notation of "$275,000" was made which was the original price Moodie quoted to Koenig on the *ductwork* quotation.

Koenig indicated he felt the prices on the two quotations for ductwork and soundtraps were too high; Moodie than came to New York to confer with Koenig and thereafter on July 31 Moodie resubmitted the ductwork quotation at a price of $220,000. The July 25 and July 31 ductwork quotations were the same regarding the scope of the work except for the following addition:

3. ALTERNATES:

Offsets and other added duct not shown or plans to be priced with .425 multiplier plus freight on 7–1–71 SEMCO Price sheet.

Mr. Moodie of Semco testified that this provision gave the seller a way of pricing later requested additions (ductwork not shown on the drawings) and "offsets." [2]

---

2. Offsets were described as ductwork used to change the direction of airflow. There was also a specific Semco catalog item labeled an "offset." Moodie testified that by the phrase "[o]ffsets and other added duct not shown" he meant to exclude *all* offsets, not just those *not shown.* He contends he lowered the ductwork quotation price because of the exclusion of offsets and because he "figured all the duct work to be delivered in 1974." No date or year for delivery however is mentioned on the quotations, the purchase order or in the acknowledgment.

The July 25 soundtrap quotation price of $52,000 was reduced to $15,000 on the July 31 quotation due to the fact that the first quotation offered to sell the entire sound-trap, while the second offered only the baffles, except for ten. The combined price on these two quotations of $235,000 was later reduced in mid-August after a telephone conversation between Koenig and Moodie, and $207,500 was the price finally settled upon.

As a result of that phone call, Koenig submitted a purchase order on FSM's purchase order form. It required that Semco provide the materials in accordance with the attached plans, specifications, and prepared mechanical drawings as follows:

> On these drawings, you are to supply all of the material which is designated on the upstream or high pressure side of mixing boxes and which is shown as:
>> All the round ductwork and fittings and all the flat oval ductwork and fittings.

The price on this August 16, 1973, purchase order was $207,500. The purchase order was "acknowledged" by Semco on its acknowledgment form dated September 7, 1973, though FSM's dating stamp indicates it was received by them on October 16, 1973. The "materials to be supplied" section on the acknowledgment form was essentially the same as the last quotation,[3] and the acknowledgment referred to the July 31 quotation date and number. The price, in accordance with the purchase order was $207,500. "All offsets" were placed under the "EXCLUSIONS" section rather than under the heading "ALTERNATES," a heading which does not appear on the acknowledgment form.[4]

On October 30, 1973, a letter from FSM informed Semco that it had received Sem-co's acknowledgment of the order, reminded them that the purchase order was made August 16, and urged that it was "imperative" that they furnish to FSM the "design data" and "price sheet," as had been requested.

Exhibits of correspondence introduced at trial indicate that Koenig continued through December 1973 and January 1974 to request "dimension and layout data on [Semco's] pipe and fittings" and "submission data for the sound traps" in order to proceed with its work on the subcontract.[5]

On February 11, 1974, Moodie (Semco) wrote to Koenig (FSM), relating his uneasiness that progress on the job site was slow and suggesting either 1974 delivery of the materials "in accordance with our original understanding," or different price terms for deliveries *after* 1974. Moodie also suggested that he was "not at all sure that our companies are together in our understanding of our scope of work." Koenig responded on March 6, 1974, stating he did not understand Moodie's problem with the scope of the work, suggested they meet, and again stressed the "importance of having the submissions on the sound traps * * * *."

However, Moodie's letter of May 24, 1974, referring to a May 9 telephone conversation, renewed his objections about "scope, price, delivery and other conditions," and concluded by stating: "[a]ccordingly I advised you during our telephone conversation that *you should look elsewhere for a source of supply* for this project." (Emphasis added.) Two similar letters of increased intensity were sent by the parties with FSM asserting that a contract existed and setting an "ultimatum" date of June 10 for Semco to clarify its intentions.

---

**3.** The acknowledgment deleted the phrase "[t]wo feet of flexible duct is figured at mixing box."

**4.** The qualification regarding the multiplier to be used for additions to the ductwork, which had also been under "ALTERNATES" on the July 31 quotation, was elsewhere on the acknowledgment form under "REMARKS."

**5.** According to Koenig, these data on details of manufactured equipment were needed both for submission to the government for their required approval and for the contractor's (FSM's) job of drafting, coordinating and layout. FSM admits that the "ductwork catalog" and some other materials were provided by Semco as FSM had requested.

On June 17 Semco responded stating that FSM was in error and that "simultaneous agreement between the parties, has never been achieved." New prices for materials which Semco was willing to offer were quoted to FSM based on a multiplier. In a June 20 mailgram FSM declared that it construed Semco's correspondence as a repudiation of the contract, and that it would purchase cover materials if it had not heard from Semco by close of business on June 25. FSM subsequently entered into two contracts, one for ductwork and one for soundtraps with other suppliers and then sought to recover the damages it incurred thereby in this lawsuit.

In the district court proceedings FSM filed with the court a motion for a partial directed verdict, which it claims to have offered at the close of all the evidence, requesting the court to find that as a matter of law FSM and Semco had entered into a contract and that the defendant had repudiated and breached the contract. It concluded that the "sole evidentiary issue" for the jury was the amount of damages to be awarded. The directed verdict also requested a finding that Semco failed to provide evidence on its counterclaim that the contract was induced by fraudulent misrepresentation.[6] At the bottom of the motion the trial judge had written "Motion Granted, 7/15/76" and his initials. Neither party was informed that the motion was granted however and it is unclear as to whether the trial judge intended to grant all or part of the motion. At the jury instruction conference the trial judge expressed his decision that as a matter of law a contract to deliver materials within a reasonable time did exist, but he indicated he would submit other issues concerning the defendant's liability to the jury. The jury was asked to decide if FSM performed its obligations under the contract, if the time requested for final delivery was "reasonable," if Semco had refused to deliver the materials, and if FSM was thereby damaged. The jury returned a verdict for defendant.

Because of our resolution of the case on the merits, we will not address FSM's claim that a directed verdict had *in fact* been granted in its favor at this time, or Semco's assertion that the trial judge's notation of "Motion Granted" really referred only to the counterclaim.[7]

We do conclude, however, that FSM's motion for a directed verdict should have been granted as requested, leaving to the jury only the assessment of damages.

Semco makes two assertions that FSM's directed verdict motion was procedurally deficient.

■ Semco's first assertion is that the motion for directed verdict was not properly made before the district court. Motions for a directed verdict may be in writing, which is the better practice, or made orally during the course of a hearing or trial. C. Wright & A. Miller, Federal Practice and Procedure § 2533, at 581 (1971).

FSM's motion was made in writing and the court clerk's dating stamp indicates it was filed on July 15, 1976; this was the same date stamped on Semco's similar motion for directed verdict. The court acted on both, writing "denied" on Semco's, and "granted" on FSM's.

Semco points out, however, that FSM's motion was not "presented orally" in open court and that FSM's *written* motion does not show service on Semco. Counsel for Semco says they "have no recollection of seeing or hearing of the motion until after the trial." FSM disputes this, urging both in its brief on motion for judgment notwithstanding the verdict and in oral argument here, that FSM's counsel personally handed the Semco counsel a copy of the motion at the time it was given to the trial court.

It is true that neither presentation nor argument on FSM's motion appears in the trial transcript provided to this court; it is

---

**6.** According to the trial court, the defendant withdrew this counterclaim before the case was submitted to the jury.

**7.** The district court *appendix* to the case file shows that the directed verdict as to the "counterclaim" was granted on July 15.

also true that argument on Semco's motion was also apparently made off the record.

■ However, the trial court clearly had a copy of FSM's motion and was aware of its contents; and considering the record as a whole, we decline to resolve the factual dispute as to whether or not Semco was handed a copy of the written motion during the trial. Beyond its allegation that an error occurred, Semco makes no allegation that it was prejudiced in any way, or that it would have proceeded differently with its presentation of evidence at trial. At the jury instruction conference counsel for Semco argued extensively with the trial judge on the first point of FSM's motion, that a contract existed as a matter of law. Without some allegation of prejudice, we will not hold that the motion was not properly before the trial court or before this court on appeal.

■ Secondly, Semco argues that FSM did not adequately advise the trial court of the "specific grounds" for its directed verdict motion as required by Fed.R.Civ.P. 50(a). We reject this contention. FSM's motion, which urged a "legally enforceable and binding contract" between the parties, "evidence of defendant's repudiation and breach * * * [that was] overwhelming" and that the "sole evidentiary issue to be determined by the jury . . . is the amount of damages," is sufficient under *Railway Express Agency v. Epperson*, 240 F.2d 189, 193 (8th Cir. 1957). "It is apparent * * * that the trial judge knew what counsel was driving at." *Id.* at 193.

We likewise reject Semco's argument that the motion for directed verdict erroneously failed to specify all the fact issues relating to liability as set out in the instructions to the jury. *Rochester Civic Theatre, Inc. v. Ramsay*, 368 F.2d 748, 752–53 (8th Cir. 1966), relied on by Semco, is a case in which the movant unsuccessfully sought, by a *general* motion for directed verdict, to preserve an *individual* fact issue on appeal. In this case, we have determined that FSM was entitled to a favorable ruling on its motion for directed verdict on all issues relating to liability, and that the only issue

which should have been submitted to the jury, under proper instructions, was the amount of damages to be awarded.

## I. Scope of the Work

At trial Semco resisted the trial court's conclusion that a contract had been created as a matter of law; a large part of the defendant's case was devoted to its assertion that the elements necessary to the *formation* of a contract were never present. Specifically, Semco urges that it had not accepted the offer of FSM because the terms in the acknowledgment regarding the description of the work differed so significantly from the term covering the work proposed in the purchase order that no mutual assent on the essential terms existed.

According to Semco's interpretation, the difference between the materials included in FSM's purchase order and the materials *excluded* in the Semco acknowledgment amounted to over $150,000 worth of goods. To support its interpretation at trial, Semco's expert witness showed on differently colored schematics of the contract drawings those portions of the ductwork which, in his opinion, would be included within the terms of the purchase order and which, in his opinion, would be included within the terms of the acknowledgment.

It was FSM's contention at trial, through Koenig's testimony, that the purchase order language did *not* vary from the scope of the work as set out in the acknowledgment; he testified that he never intended to order those items which Semco listed as exclusions, with the possible exception of the exclusion of "offsets" which Koenig admitted "did get by me."

On appeal Semco still urges that no contract exists as a matter of law, and FSM has referred the court to U.C.C. § 2–207, which provides that "[a] definite and seasonable expression of acceptance * * * operates as an acceptance even though it states terms *additional to or different from those offered* or agreed upon * * *." (Emphasis added.) According to Semco, FSM's reliance on that section is misplaced;

it still requires a "definite \* \* \* expression of acceptance" and that would preclude a return document that "diverges significantly as to a dickered term" as operating as a § 2–207(1) acceptance. J. White & R. Summers, Uniform Commercial Code Sec. 1–2, at 32 (1972).

■ We agree with Semco that an "acceptance" is a prerequisite to the application of § 2–207 and that "[o]nly where all the traditional criteria of intent are met showing that a contract has been made should Section 2–207 be applied; only then should the prescriptions of Section 2–207 as to additional terms become relevant." R. Duesenberg & L. King, Bender's Uniform Commercial Code Service § 3.05, at 3–51 (1977).[8] *See Duval & Co. v. Malcom,* 233 Ga. 784, 214 S.E.2d 356 (Ga.1975). The court here must interpret the terms of the offer and the acceptance, which are stated differently, to determine if the return document diverges *significantly* as to a dickered term; in our interpretation it does not, and a definite and seasonable expression of acceptance was given.

■ The antecedent negotiations and circumstances prior to the submission of the purchase order convince us that the buyer clearly intended to limit the scope of his purchase order in accordance with the exclusions set out in the acknowledgment. The quotations clearly served as the basis for the purchase order in this case; with the exception of offsets being placed under "ALTERNATES" instead of "EXCLUSIONS," the exclusions in the acknowledgment are identical to the exclusions in the second quotation. The parties bargained with reference to the second quotation and thereafter arrived at a price of $207,500,

the same price used on the purchase order and repeated in the acknowledgment. It is even apparent that a number of the exclusions are part of Semco's printed form and would appear to be routinely excluded without reference to the negotiations.

These documents in no way indicate that FSM in its purchase order intended to *include* those items which had been excluded throughout the course of the negotiations. In fact, FSM promptly acknowledged receipt of Semco's acknowledgment without objections and with the obvious understanding that the parties had a contract. The quotations are clearly relevant in discerning the parties' intent: "[A party] may prove the antecedent negotiations and communications between the parties for the purpose of determining the meaning justly to be adopted and made effective by the court." A. Corbin, Corbin on Contracts § 543, at 519 (1 Vol.Ed.1952). Furthermore, it is clear that "[t]he concept of construing a commercial transaction in accordance with the *parties'* intent pervades the Code", *Stewart-Decatur Security Systems v. Von Weise Gear Co.,* 517 F.2d 1136, 1140 n.11 (8th Cir. 1975) (emphasis added), and we decline to interpret that intent in this case in accordance with Semco's expert witness' understanding of the language. The interpretation the buyer now urges is consistent with these documents and certainly one about which the seller had reason to know. FSM has conceded that the exclusion of offsets became part of its contract with Semco and is willing to exclude damages to the extent of their value.

We conclude that a contract existed in accordance with the exclusions and the other provisions set forth in the acknowledgment by Semco dated September 7, 1973.

---

**8.** The sequence of negotiation and the exchange of purchase order and acknowledgment forms clearly show "agreement" and an intent to enter into a contract. U.C.C. § 2–204(1) provides that "[a] contract for sale of goods may be made in any manner sufficient to show agreement \* \* \*," and an agreement "means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance \* \* \*." U.C.C. § 1–201(3). In response to

the terms of the purchase order offer Semco mailed its acknowledgment form which stated "[t]hank you for your order. This is an exact description of your order as *accepted* by us." (Emphasis added.)

The conduct of the parties prior to February 1974 is consistent with the conclusion that the parties intended to contract. Moodie admits he waited until that date before pointing out to Koenig any differences between the purchase order and acknowledgment.

## II. Time for Performance

In the trial court Semco had argued both that there was no contract to supply materials after 1974, pursuant to an oral agreement, and that the plaintiff, FSM, was seeking to induce Semco to maintain fixed sales prices for an unreasonably long time and to make deliveries at such prices for an unreasonably long time by requesting deliveries after 1974.

The district court concluded that a contract existed as a matter of law, and that Semco had promised to deliver materials for a "reasonable" time; the court instructed the jury that it must return a verdict for FSM if it found, inter alia, that "the time requested by Federal Sheet Metal for final delivery of the materials promised by Semco when the contract was entered into in October 1973, was reasonable, considering the nature, purpose and circumstances of such action, * * *." (Emphasis added.)

Our review of the documents convinces us, however, that it was not necessary to infer a "reasonable" time for performance, as the parties had agreed on a term for delivery. Federal Sheet Metal's purchase order form, under a box labeled "date required," stated the trade phrase "as released." This phrase was repeated in the Semco acceptance in the "date wanted" box; the "date promised" space had been left open. No contrary term is found in the preceding documents of the parties, and we feel that the language of the parties is sufficient to show agreement and Semco's acquiescence to this contractual term.[9] Moreover, there is unrebutted evidence as to the interpretation of this phrase as supplied by trade usage.[10]

Koenig testified that since the sheet metal trade was a "following trade" FSM generally bought from vendors on an "as-released basis," which required Semco to supply the materials as FSM needed them and as the building was ready.[11] "As-released"

9. Considering the sequence of events in this case, the quotations and prior negotiations, an oral agreement on price followed by a written purchase order and acknowledgment using the agreed price term, we are convinced that the latter two forms represent the final expression of the parties' agreement and are a "complete and exclusive statement of the terms of the agreement * * *." J. White & R. Summers, Uniform Commercial Code Sec. 1–2, at 32 (1972). Semco's form so provides. "There are no understandings, terms or conditions not fully expressed herein."

In any event, Semco's parol evidence of a prior oral understanding between Koenig and Moodie to deliver all materials in 1974 was flatly denied by witnesses for FSM and was insufficient to prove that an agreement existed. None of the writings prior to the time the controversy arose mention 1974 or a 1974 delivery term. Semco's own internal records show production on the Walter Reed job forecast into 1975.

10. U.C.C. § 2–202 permits evidence of trade usage to explain contract terms under the Code's parol evidence rule.

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

(a) by course of dealing or usage of trade (section 400.1–205) or by course of performance (section 400.2–208); and

Mo.Ann.Stat. 400.2–202 (emphasis added).

The Code defines "usage of trade" in § 1–205(2):

A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts.

Mo.Ann.Stat. 400.1–205(2).

11. Koenig testified as to the meaning of "as-released":

Q. Would you tell us what "as released" means in the trade?

A. Since the trade is a customized industry there's a great deal of detail work that goes into the drafting layout coordination of all of the work that we have to install and a great deal of time and effort goes into it and each run of duct work is individually designed and individually ordered and so depending on the progress of the building, since our trade is known as a following trade, we must have a building, we must have concrete and steel before we can even begin our work. We generally buy from vendors, we buy this type of material on an as-released basis. As we need it they are to supply it, as the building is ready for it, as it is co-ordinated, as it is drawn, as it is detailed.

referred to "no specific date" but was "just within the envelope of the life of the job;" according to Koenig, the life of the job at that time was January or February 1976. Moodie acknowledged that at the time he submitted Semco's quotations he was fully aware that the completion date of the hospital under the plans was February 1976.

In the absence of any other extrinsic evidence or allegation offering a different interpretation of this term, we find that Semco agreed to deliver the ductwork materials on an "as-released" basis, which, in our opinion, obligated Semco to make deliveries under the contract terms and at the stated price at least until February 1976, which was the anticipated life of the project at that time.[12] The jury should have been so instructed. *See Jazel Corp. v. Sentinel Enterprises, Inc.*, 20 U.C.C.Rep.Serv. 837, 839 (N.Y.Sup.Ct.1976); C. Wright & A. Miller, Federal Practice and Procedure § 2535, at 591 n.9 (1971). Accordingly, FSM is entitled to the damages it incurred due to the failure of Semco to provide the materials as promised until that date. It appears the FSM effected "cover" in October and December 1974 for the ductwork and soundtraps by contracting with two other suppliers, U. S. Air Duct Corp. and Bartholomaus Enterprises. However, Federal Sheet Metal has not sought a directed verdict on the measure of damages, and admits "a bona-fide controversy over some elements of FSM's damages." We therefore leave the assessment of damages, the appropriateness of the "cover" and the legitimacy of incidental damages as issues to be resolved in a new trial. FSM has conceded that "offsets" should be excluded from the assessment of damages.

We conclude that evidence of Semco's repudiation and breach, viewed most favorably to Semco, requires us to conclude that Semco did refuse to perform, that there is insufficient evidence to permit any other finding, and that the jury should have been so instructed on this point. Corre-

spondence beginning in May 1974 clearly shows Semco's unwillingness to perform under the terms of the contract as we have found existed at that time. (Semco wrote on May 24, 1974: "[Y]ou [FSM] should look elsewhere for a source of supply for this project"); despite FSM's encouragement to Semco to perform as "the easiest way for both of us and probably the least expensive to you," Semco replied that it had lost "all interest" in doing the work on "a lump sum price basis." Semco has not pointed to any contradictory evidence or evidence which indicates that it was willing to perform the contract as agreed upon.

In accordance with our conclusions that a contract existed as a matter of law to deliver materials through February 1976, and that the seller repudiated and breached that contract, we reverse and remand for a new trial limited to the issue of the buyer's damages.

---

**12.** Testimony at trial indicated that the predicted completion date at that time was *October 1976*.