**Virgil DOTSON, et al.,**
**Plaintiffs-Appellants,**

v.

**U.S. DEPARTMENT OF HOUSING AND**
**URBAN DEVELOPMENT, et al.,**
**Defendants-Appellees.**

**No. 83–3037.**

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 25, 1983.

Decided April 3, 1984.

**314**

Glenn G. Galbreath, argued, Advocates for Basic Legal Equality, Inc., Toledo, Ohio, for plaintiffs-appellants.

John W. Herold, argued, OGC-litigation, Washington, D.C., John D. Scouten, Asst. Law Director, Toledo, Ohio, Patrick J. Foley, Asst. U.S. Atty., Toledo, Ohio, for defendants-appellees.

Before JONES and KRUPANSKY, Circuit Judges, and SPIEGEL, District Judge.*

NATHANIEL R. JONES, Circuit Judge.

Appellants, Virgil Dotson, et al. (Dotson) are presently before this Court to appeal an order of the district court denying their motions for enforcement and modification of two stipulations into which they entered with the City of Toledo (The City) and the Department of Housing and Urban Development (HUD). Dotson contends that the district court erred in failing to judge HUD's compliance with those stipulations in accordance with the standard of "all necessary, reasonable and appropriate steps" as required by the 1977 stipulation. Upon consideration of the issues presented by this appeal, we agree that the district court erred in judging HUD's compliance in accordance with a less stringent "reasonableness" standard.

In December, 1974, a class of low income individuals [1] filed suit alleging that actions taken by HUD and the City of Toledo violated the constitution and federal fair housing laws. After three years of litigation the parties entered into a Stipulation and Settlement. That Stipulation was approved by the Northern District of Ohio on Decem-

---

* The Honorable S. Arthur Spiegel, United States District Court for the Southern District of Ohio, sitting by designation.

1. The class and subclass were certified:
All low income residents of the City of Toledo who have been, or who are, scheduled to be displaced, poorly housed, or otherwise sub-stantially affected by the City of Toledo's Urban Renewal Neighborhood Development, Workable Programs, Community Development, and other related activities which have previously been implemented or are planned by the defendants.

ber 17, 1977 (The 1977 Decree). The Settlement imposed upon the defendants-appellees the burden of assuring low income individuals access to housing. In pertinent part, the Stipulation and Settlement provided:

a) HUD would take all steps reasonable and necessary, consistent with statutory authority, to make available during a four (4) year period ending September 30, 1981, funds for at least two thousand (2,000) subsidized family housing units. Furthermore, HUD agreed to use best efforts to promote and facilitate, consistent with federal regulations, the development, construction, and occupancy of those units;

b) The City would cooperate with HUD in planning, developing, constructing, and having occupied at least two thousand (2,000) low income housing units;

c) HUD and the City would take all steps reasonable, necessary and appropriate, consistent with the valid exercise of their powers, to accomplish the twin goals of reducing the geographic compartmentalization of racial and income groups in Toledo, and fostering more diverse and vital neighborhoods by city-wide dispersal of housing opportunities for minorities and families of low and moderate incomes;

d) The City would prepare and execute, consistent with the valid exercise of its powers, a five year housing plan which would result in the placement of a fair share of federally subsidized housing in each of the eleven (11) Toledo Urban Planning Districts:

e) HUD and the City would take all steps reasonable and necessary to comply with the terms and conditions of the Stipulation and Settlement.

In 1980, the City and HUD approved three subsidized low income family housing projects for the Reynolds Planning District. A dispute arose when it became evident that this approval violated the 1977 stipulation by drawing funds from subsidized, non-minority areas.

On October 10, 1980, the parties entered into another Settlement, entitled Stipulation and Order (the 1980 Decree), which was designed to resolve this dispute over the failure of the City and HUD to comply with the 1977 Settlement. That 1980 Decree provided *inter alia:*

2. This Stipulation and Order is not, and should not be construed as an amendment to the September 15, 1977 Stipulation and Settlement. [With one exception], the parties retain all rights granted under the September 15, 1977 Stipulation and Settlement . . . .

.        .        .        .        .

4. *During fiscal years 1981 and 1982,* [HUD] shall allocate sufficient funding to provide for and they shall advertise for the new construction of twenty (20) units of Section 8 family housing in the Southside Planning District . . . and seventy (70) units of Section 8 family housing in the West Toledo Planning District . . ., and *one hundred fifty (150) units of Section 8 family housing units in the Westgate Planning District. . . .* It is agreed that funding for these units shall be provided from either the HUD central office reserve subject to an adequate allocation being provided by Congress, or funds recaptured by HUD and that provision of these units shall in no way diminish any funding that would otherwise be allocated for subsidized housing in the Toledo Metropolitan Area.

.        .        .        .        .

5. The Housing Units mentioned in paragraph 4 above may be reduced by forty-nine (49) in the event the ARC/COR I project is relocated and construed in one of the planning districts mentioned in paragraph 4 (emphasis added).

HUD was thereby required to fund and advertise private developer proposals for the construction of 240 housing units of Section 8 family housing in Southside, West Toledo and Westgate planning districts. These locations were chosen because of (1) the virtual absence of subsidized housing, (2) a history of the lack of

subsidized housing in these areas due to the high cost of land development and racial opposition, and (3) the fact that these areas had been specifically identified for new construction housing in the 1977 decree's five year plan. The 1980 settlement essentially provided funds and advertising for the development of low cost housing in these specific planning districts.

The housing in these districts is categorized as Section 8 housing. The Section 8 New Construction program is a 20 year rent subsidy program financed by HUD. The low income tenants are required to pay about one quarter of their income toward rent. HUD predetermines the amount of rent. *See* 42 U.S.C. § 1437f, 24 C.F.R. Ch. 880. HUD subsidized housing is attractive to private developers because they are assured of a steady stream of occupants. Before a developer is assured that HUD has committed itself to a district, several administrative steps are typically followed. The HUD office first allocates funds on the regional level and suballocates those funds within each region. In the case at bar, HUD agreed in the 1980 Decree to suballocate funds requisite to the development of 240 low cost units in the selected districts.

After receipt of funds, the Field Office typically prepares an advertisement and developers' package. A Notification of Fund Availability (NOFA) is also published to solicit housing proposals from developers. The NOFA ad usually is published once a week for two consecutive weeks. *See* 24 C.F.R. § 880.304 and 24 C.F.R. § 881.304. An interested developer must then contact HUD, obtain a developer's package, locate and secure a site, develop architectural plans, locate potential financing, gain zoning approvals, obtain building permits, and finally submit an application.

HUD examines the developer's completed proposal, routes the proposal to intra-agency review boards and then to the Housing Programs Branch. After a proposal has been approved, notification is sent to the developer and funding is sent to the Field Office. Construction begins when funding has been received and the developer has complied with technical building requirements.

All of these steps must occur before the end of the fiscal year (September 30); otherwise, under normal circumstances, HUD may recapture the funds. In fiscal year 1981, the HUD field office advertised a NOFA for 70 units in the Southside planning district. The NOFA was published on February 11 and February 18, 1981. No proposals were received for the Southside district. HUD ultimately approved and funded one project for 40 units in the West Toledo district. But HUD made no proposals for Westgate.

On March 29, 1982 the HUD field office in Cleveland was granted funding for 157 units of Section 8 housing. This allocation, which was transferred from the Chicago office, was made "in accordance with the *Dotson* litigation." The City of Toledo, in conjunction with plaintiffs' counsel, recommended 101 units in Westgate, 30 units in West Toledo, 20 units for South Toledo and West Toledo and 6 units for the handicapped.

On May 5 and May 12, 1982, HUD advertised fund availability for all of these 151 units. The Cleveland office received three proposals for Westgate, four for West Toledo and two for Southside. HUD approved a 26 unit proposal for Westgate, a 30 unit proposal for West Toledo and a 20 unit proposal for Southside. These proposals were approved and funded through the necessary HUD procedures.

On September 29, 1982, HUD received a fourth proposal for Westgate. This proposal was not processed through HUD's typical procedural channels. Cleveland Multi-Family Housing Representative, C. Edward Caldwell, stated that the proposal probably would not have met approval. As the 1982 fiscal year closed, therefore, 75 Westgate units remained unapproved. Funding for the units would be returned to HUD.

The district court's alleged failure to enforce adequately the terms of the 1977 and the 1980 Stipulations is the primary subject of this appeal. In particular, HUD agreed

in the 1980 Stipulation to advertise and provide in 1981 and 1982 funding for construction of certain designated housing units necessary to the dispersal of housing in Toledo. The appellants argue in chief that the district court failed to apply this provision of the Settlement.

On March 4, 1982, the plaintiffs moved the district court for a temporary restraining order which would prohibit HUD from withdrawing funds for 75 units of low income family housing in Toledo and which would require HUD to readvertise in Toledo. After a hearing, the Court granted the TRO.

On November 16, 1981, the district court, however, denied the plaintiffs' motion to enforce the two settlement decrees. The district court did order HUD to escrow the funds earmarked for the 75 units pending the outcome of plaintiffs' appeal. Appellants filed a notice of appeal on January 14, 1983.

■ They contend that the district court failed to interpret properly the scope of the 1980 and 1977 Stipulations.[2] They argue that the 1977 decree requires the district court to apply the "all necessary, reasonable and appropriate steps" standard to judge HUD's conduct. Thus although the facts of this case are quite complex, appellants' initial argument involves a question of contractual interpretation.

The district court concluded that HUD's conduct must be judged in light of the terms of the 1980 decree. That decree is silent as to the time for performance. The district court, therefore, implied a "reasonable time" for performance, claiming

> When a contract fails to state a specific time for performance, the law will imply a *reasonable time* ... (emphasis supplied).

The district court applied a reasonableness test in determining that the publication of a NOFA less than five months before the end

2. Before we reach the question of whether the district court applied the proper standard in reviewing HUD's compliance, we must consider the scope of the judiciary's remedial power to insulate from congressional recapture the funds originally earmarked for that compliance. This Court concludes that HUD had authority to use previously appropriated funds in between fiscal year 1981 and the next congressional appropriation and that the district court had authority to prevent the recapture after fiscal year 1982 of funds originally set aside for compliance with the 1980 decree.

Section 5(c) of the U.S. Housing Act, 42 U.S.C. § 1437c(c), provides HUD with permanent authority to commit funds to Section 8 program housing. That authority has no temporal constraints; the funds in fact are available until Congress terminates HUD's authority. Through specific appropriations acts, Congress periodically provides HUD with additional funds. In fiscal year 1981, Congress appropriated to HUD sufficient funds for compliance with the decree. Those funds effectively remained available through the relevant compliance period. P.L. 96–526, 94 Stat. 3044; 42 U.S.C. § 1437c(c)(1). Congress therefore empowered HUD to use previously appropriated Section 8 funds to fulfill its obligations under the 1980 decree even after the end of fiscal year 1981. HUD clearly does not, nor could it, rely upon the lack of authority to use previously allocated funds as a justification for its non-compliance.

We find in addition that the district court has the authority to prevent the recapture of earmarked funds after fiscal year 1982 and to or-

der their use toward compliance. Because HUD's authority to employ Section 8 appropriations is "permanent" (42 U.S.C. § 1437c(c)), HUD did not require specific authorization on September 30, 1982 to permit it to continue to fund housing with previously appropriated funds. As of September 30, 1982, Congress had not terminated HUD's general authority to pursue section 8 housing. No lapse therefore existed in HUD's funding authority.

In *National Association of Regional Councils v. Costle*, 564 F.2d 583 (D.C.Cir.1977), the court found well-accepted the power of a court to enjoin an agency from recapturing funds where its order is entered before a lapse in the agency's funding authorization. 564 F.2d at 588–89. Congress did not terminate HUD's authority to enter into Section 8 contracts until December 21, 1982. (P.L. 97–377, 96 Stat. 1907). Before that termination, the district court had ordered the reservation of funds for the 75 housing units which are the subject of this litigation. Those funds therefore were not subject to recapture when HUD's general authority was terminated. HUD in fact obtained a specific authorization from Congress to fund an additional 900 section 8 units to cover its potential litigation commitments. P.L. 98–63, 97 Stat. 301, 319–20. The 75 units at issue in the case at bar are included within that 900 unit authorization. We conclude therefore that the district court has the authority to order the commitment of funds for those 75 units.

of the 1982 fiscal year did not constitute a breach of the 1980 decree. Appellants argue that the "necessary, reasonable and appropriate" standard of the 1977 decree should read into the 1980 decree.

■ A consent decree is a strange hybrid in the law; it is both a contract that has been negotiated by the parties and a court order which can be altered by a court if circumstances warrant. *Brown v. Neeb,* 644 F.2d 551 (6th Cir.1981). This Court has held that "since consent decrees and orders have many attributes of ordinary contracts, they should be construed basically as contracts." *Neeb,* 644 F.2d at 557; *citing United States v. ITT Continental Baking Co.,* 420 U.S. 223, 236–37, 95 S.Ct. 926, 934–35, 43 L.Ed.2d 148 (1975).

■ The terms of a consent decree, unlike those of a simple contract, however, have unique properties. *See ITT Continental Baking Co.,* 420 U.S. at 236 n. 10, 95 S.Ct. at 934 n. 10. The circumstances surrounding the formation of the decree help determine the purpose for which the decree was entered. *Neeb,* 644 F.2d at 562; *United States v. Bechtel Corp.,* 648 F.2d 660 (9th Cir.), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 638, 70 L.Ed.2d 617 (1981). The binding substantive commands of a consent decree are embodied within decree's "four corners." *United States v. Armour & Co.,* 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971). A decree embodies the legal constraints which govern the behavior of the parties during the life of the decree. *ITT Continental,* 420 U.S. at 236, 95 S.Ct. at 934. If the language of the decree is ambiguous, however, the court's interpretation of its substantive commands may depart from the "four corners." *United States v. Motor Vehicles Manufacturers Association,* 643 F.2d 644, 648 (9th Cir. 1981).

■ The initial question for review is whether the appellees breached their duty under the express and implied terms of the decree. The district court properly found that the "four corners" of the 1980 decree did not provide explicit guidance on the intent of the parties. In the face of the

decree's apparent "silence," the district court implied a "reasonable time" for performance. *Citing, Bach v. Friden Calculating Machine Co.,* 155 F.2d 361 (6th Cir. 1946). The court's implication of a "reasonable time" is supported by Section 2–309(1) of the Uniform Commercial Code. That section provides that where the parties have neglected to specify the "time for delivery," that time shall be a "reasonable time." *See also White and Summers, Uniform Commercial Code,* p. 105. This practice is appropriate in the commercial contract field because it encourages the formation of binding contracts among business entities. But this commercial law policy has little place in the field of fair housing decrees. Section 2–309, in fact, does not apply at all where the time for performance is geared toward completion of a specific project *United States Industries v. Semco,* 562 F.2d 1061 (8th Cir.), *cert. denied,* 434 U.S. 986, 98 S.Ct. 613, 54 L.Ed.2d 480 (1977). Although the district court properly went beyond the explicit language of the 1980 decree to ascertain the parties' intent, we find that it improperly supplied that intent with a reasonableness term.

■ In the context of a fair housing consent decree, which is geared toward the completion of a specific project, the district court erred in not interpreting the decree in light of the "circumstances surrounding its formation." *See Neeb,* 644 F.2d at 562. One such "circumstance" is the existence of the 1977 decree. In that decree, HUD promised to "take all steps reasonable and necessary ... to make available during a four (4) year period ending September 30, 1981 funds for at least two thousand (2000) subsidized family units." In addition, HUD agreed to use its "best efforts to promote and facilitate ... the development, construction and occupancy of those units." According to the express terms of the 1977 decree, the City of Toledo was required to prepare and execute a "five year housing plan which would result in a fair share of federally subsidized housing in each of the eleven (11) Toledo Urban Planning Districts." Finally the decree required HUD

and the City to take "all steps reasonable, necessary and appropriate" consistent with the twin goals of:

reducing the geographic compartmentalization of racial and income groups in Toledo, and fostering more diverse and vital neighborhoods by city wide dispersal of housing opportunities for minorities and families of low and moderate income.

The terms of this decree were in effect when a dispute arose between the parties in 1980. The plaintiffs feared that the allocation of funds to a district not involved in the "five-year plan" (Reynolds) would necessarily detract from those funds available for the areas involved in the plan. The plaintiffs therefore sought a court decree which would reaffirm the fund allocations contemplated by the 1977 decree. These events therefore provide the circumstances which should have informed the district court's interpretation of the 1980 decree.

That decree should have been interpreted as a *quid pro quo* which did not sacrifice any of the plaintiffs' rights under the 1977 decree. The 1980 decree indeed states that this "Stipulation and Order should not be construed as an *amendment*" to the earlier decree. (emphasis added). The district court interpreted this language to mean that the 1980 decree was separate from and not guided by the 1977 decree. But the next sentence of the 1980 decree clearly refutes this interpretation. The parties agreed that

Except as provided in paragraph 6 of this Stipulation and Order, the parties retain all rights granted under the September 15, 1977 Stipulation and Settlement.

In Paragraph 6, the plaintiffs agree to forego only the specific dispersal requirements under the 1977 decree with respect to Hilltop and Southgate Woods district. The plaintiffs allowed HUD to divert those dispersals to the Reynolds district. Paragraph 6, therefore, was clearly a specific concession made by the plaintiffs in return for the assurance of HUD actions in accord with the 1977 decree. The plaintiffs for-

feited their right to demand HUD compliance in Hilltop and Southgate Woods in return for the reaffirmation of their remaining rights under the 1977 decree. Paragraph 6 is the only provision in the new decree which specifically and explicitly "amends" the older decree. The parties clearly intended to retain "all" other rights secured under the 1977 decree.

Those rights include the right to require the City and HUD to take all reasonable, necessary and appropriate steps to secure the goal of racial integration through dispersal of funds for low cost housing. One of those "steps" is required specifically by the 1980 decree. Paragraph 4 provides that, "[d]uring fiscal year 1981 and 1982, Federal defendants shall allocate sufficient funding to provide for and they shall advertise for new construction" in Southside, West Toledo and Westgate.

The standard for compliance with this explicit requirement, while it is not explicit in the 1980 decree, is clearly provided in the catch-all provision which upholds all rights under the 1977 decree. The defendants' obligation to "take all steps reasonable necessary and appropriate" to effectuate the goals secured under the 1977 decree is nowhere excused under the 1980 decree. We conclude that the district court erred in applying to HUD's performance under the 1980 decree a mere "reasonableness" test. We therefore remand this case to the district court for a determination of whether HUD took "all steps reasonable necessary and appropriate" to meet its obligations under the 1977 and 1980 decrees. If the district court finds that HUD has not met those obligations, that court has the authority to order funding for the 75 Toledo units.

Accordingly, the order of the district court denying enforcement of the 1977 and 1980 decrees is REVERSED and this cause is hereby REMANDED for proceedings consistent with this opinion.

KRUPANSKY, Judge, dissenting.

The majority opinion disregards the district court's reasonable interpretation of

the consent decrees in issue and adopts the plaintiff's wholly unsupportable position. Accordingly, I dissent.

As Judge Damon J. Keith of this Court has observed, the district judge's interpretation of a consent decree is entitled to great deference since "[f]ew persons are in a better position to understand the meaning of a consent decree than the district judge who oversaw and approved it." *Brown v. Neeb,* 644 F.2d 551, 558, n. 12 (6th Cir.1981). In the instant matter the district judge concluded that "the rights and responsibilities of the parties must be resolved solely by reference to the 1980 decree." Even if proper respect for the district court's intimate familiarity with the background of the consent decree did not compel this Court to afford the district judge's views extreme deference, I would still be compelled to accept the lower court's construction by the sheer force of logic.

Stripped to the bare essentials, the facts are remarkably simple. On September 15, 1977, HUD agreed with the city of Toledo pursuant to a stipulation and settlement (the 1977 Decree) to "take all steps reasonable and necessary" to make available "(a) ... during a four year period ending September 30, 1981 funds for ... subsidized family housing units" and "(e) ... take all steps reasonable and necessary to comply with the terms and conditions of the stipulation and settlement." On October 10, 1980, as a result of the plaintiffs' charges that HUD was not properly implementing its obligation defined by the 1977 Decree, the parties entered into another stipulation order (the 1980 Decree) designed to resolve the dispute over the alleged failure of the city and HUD to comply with the 1977 Decree. Pursuant to the 1980 Decree "(2) ... the parties retain all rights granted under the September 15, 1977 Stipulation and Settlement..." (the 1977 Decree). The 1980 Decree also precisely defined the number of units HUD would fund, the geographical areas to which housing units would be allocated, the number of units to be allocated to each Planning District and HUD's obligation to solicit proposals from developers for the construction of the designated planning districts by advertising for the new construction.

A comparative analysis of the 1977 and 1980 Decrees discloses that the 1977 Decree, which could be characterized as a statement of purpose, was drafted in broad generalizations. It committed HUD to take all steps reasonable and necessary to make available during a four year period ending September 30, 1981 funds for at least 2,000 subsidized family housing units. The 1977 Decree expressed a cooperative spirit to be implemented by the city and HUD to accomplish the twin goals of reducing the geographic compartmentalization of racial and income groups in Toledo, and fostering more diverse and vital neighborhoods by city-wide dispersal of housing opportunities for minorities and families of low and moderate incomes.

By comparison, the 1980 Decree, as outlined above, was far more precise and exacting in its terms. HUD's basic undertaking pursuant to the 1980 Decree was simply to initially allocate sufficient funding for the specified number of low cost housing units in the designated geographical areas within the city of Toledo, secondly, to solicit developers through appropriate advertising (Notification of Fund Availablity —NOFA) to submit proposals for the construction, and thirdly, to approve the successful preliminary proposals and thereafter execute formal contracts with the successful developers.[1] While the period for implementing the 1980 Decree was designated as fiscal years 1981 and 1982, no precise time was mentioned when HUD would begin funding the allocated units authorized in paragraph 4 of the 1980 Decree in those years.

At issue in the appeal *sub judice* is the funding for seventy-five (75) remaining

---

1. Approval of a preliminary proposal results in the funding being reserved for that project until the developer submits a final proposal (Tr. at 77, 78). While reserved, the funds are not subject to fiscal year-end recapture by HUD headquarters.

units of the (101) units, allocated by the 1980 Decree to the Westgate Planning District for which only twenty-six (26) acceptable proposals had been received as of the end of fiscal year 1982.

At the outset it should be noted that a HUD commitment to fund units for the Westgate Planning District or for any geographical area in the nation is no guarantee that the allocated units actually will be constructed. Every project is contingent upon attracting developers who submit acceptable proposals. The trial court concluded and the appellants have conceded that from the inception of these proceedings, practical and economic obstacles posed serious difficulties to placing housing units within the Westgate district. Few parcels of land were available for new construction in the area and their acquisition costs were prohibitive. Nor did the area offer a substantial number of structures suitable for rehabilitation under the Section 8 program. In sum, the Westgate area was not economically attractive to developers as is evidenced by the limited number of developer responses to HUD's advertised NOFA's.

Succinctly stated, appellants argue that the dearth of proposals was due to HUD's delay in processing funds for the Westgate Planning District. Defendants counter with the assertions that more than adequate time existed within which to process and approve proposals for the geographical area, if a sufficient number of adequate proposals had been submitted.

The resolution of the arguments rests in the operational facts developed in the record.

The point of departure for reviewing the evidence in its entirety is the unequivocal language of the 1980 Decree which obligated HUD to advertise and provide funding for the designated housing units "during fiscal years 1981 and 1982". By the clear terms of paragraph four of the 1980 Decree, HUD obligated itself to provide funding through the end of fiscal year 1982, the last day being September 30, 1982.

Responding to the appellants charges that HUD's action, or perhaps its inaction, jeopardized the funding for the remaining seventy-five (75) units allocated to the Westgate Planning District to the point that such funds would be forever lost, the trial court entered comprehensive findings of fact firmly supporting its ultimate conclusions of law.

Initially the trial court acknowledged that the critical language of the 1980 Decree "during fiscal years 1981 and 1982" could be construed to mean, as appellants contend, that HUD was obligated to make funds available for all the units of the 1980 Decree in fiscal year 1981 and continue to do so throughout fiscal year 1982, until acceptable proposals for all units were obtained. If this was indeed the HUD commitment, HUD failed to honor it. Upon further analysis, however, the trial court concluded that it was equally plausible to interpret the operative phrase to mean that so long as HUD made all the funds available sometime during the two year period, allowing adequate time for processing and awarding the successful proposals, it would be in compliance with the 1980 Decree. The trial court thereupon turned to the surrounding facts for a proper interpretation of the words "during fiscal years 1981 and 1982" as intended by the parties to the 1980 Decree.

The record discloses that HUD's understanding of the 1980 Decree required that the twenty (20) units for the Southside Planning District and the seventy (70) units for the West Toledo Planning District would be made available in fiscal year 1981, and that the one hundred fifty (150) units for the Westgate Planning District (subsequently reduced by agreement to one hundred and one (101) units) would not be made available until 1982. In this manner, all units would be funded "during fiscal years 1981 and 1982."

The HUD Field Office commenced immediate implementation of the 1980 Decree on February 11 and 18 of 1981 when it published its NOFA inviting proposals for 70 and 20 units for the West Toledo and

Southside Planning Districts respectively. After receiving a number of proposals HUD funded the 40 units for the West Toledo Planning District. No proposals were received for the Southside Planning District.

Thereafter on March 29, 1982 the Cleveland Service Office (CSO), the HUD field office with jurisdiction over Toledo, was allocated funding for one hundred fifty-seven (157) units from the Chicago HUD Regional Office with the notation "in accordance with the Dotson litigation" [appellants herein]. By letter dated April 1, 1982 the CSO informed Toledo of the available funds and instructed it to confer with appellants to establish target areas for the Section 8 housing as required by the 1980 Decree. By letter dated April 19, 1982, the City of Toledo advised HUD's CSO that a consensus had been reached as to the final target areas for the units provided by HUD.[2]

In accordance with the April 19, 1982 letter, HUD advertised fund availability for one hundred and fifty-one (151) units on May 5 and 12, 1982. HUD received nine preliminary proposals—three (3) for the Westgate Planning District, four (4) for the West Toledo Planning District, and two (2) for the Southside Planning District. A thirty (30) unit proposal was approved for the West Toledo Planning District, a twenty (20) unit proposal was approved for the Southside Planning District and a twenty-six (26) unit proposal was approved for the Westgate Planning District. It should be noted that HUD received the proposals on June 16, 1982 and thereafter expeditiously

processed them and issued notices of preliminary approval to the successful developers. HUD advised the developers, the City and appellants of its favorable action and the reservation of funds for the projects on August 13, 1982. Actually HUD, through its CSO, reserved the funds as early as August 5, 1982. Contrary to the implication of the majority opinion that "as the 1982 fiscal year closed, therefore, 75 Westgate units remained unapproved" the evidence fails to reflect that any qualified unit proposals were pending with HUD when the funding expired on September 30, 1980.[3] The record conclusively supports the trial court's conclusions that the time frame within which HUD implemented the 1982 Decree was more than adequate to process all submitted proposals, and that the lack of developer interest attributable to the obstacles inherent in the Westgate Planning District foreclosed the expectation of receiving additional proposals for this area. Appellants awareness of the lack of developer interest in the Westgate area is evidenced by correspondence between HUD, the City and Appellants (Joint Ex. 13), which disclosed an agreement between the City and Appellants to consider a modification of the 1980 Decree. The proposed modification would switch the funding earmarked for the remaining seventy five (75) units allocated to Westgate area to use in some other planning district.

Whether HUD's obligation is considered pursuant to an independent interpretation of the 1980 Decree, or whether its obligation is considered pursuant to an interpre-

---

**2.** One hundred one (101) units for the Westgate Planning District (this figure is arrived at by subtracting forty-nine (49) units comprising the ARC/COR project from the one hundred fifty (150) units specified in paragraph four of the October 10, 1980, Stipulation. This was permitted by paragraph five of that Stipulation because the project eventually was located in the Westgate Planning District);

Thirty (30) units for the West Toledo Planning District (seventy (70) units less the forty (40) units already funded for the district);

Twenty (20) units for the South Toledo/West Toledo Planning Districts; Six (6) units for the handicapped (Project Reach).

**3.** A fourth proposal for the Westgate Planning District was submitted to HUD on September 29, 1982, *one* day prior to the expiration of the fiscal year 1982. Although the proposal was not processed through HUD's review procedures due to the time constraints presented by late filing, C. Edward Caldwell, the Acting Chief of the CSO's Housing Program Branch, testified that even at that late date, the application was examined by the person in the CSO responsible for overseeing review and approval of Section 8 housing proposals, and it was his considered opinion that due to the prohibitively excessive land and relocation costs, the proposal was not viable.

tation of the 1980 Decree *in para materia* with the 1977 Decree, the intent of parties as to the manner of implementing HUD's obligation is clear.

Intent, as the trial court correctly ruled, is best demonstrated by the conduct and action or inaction of the parties, and not by the mere *post hoc* assertions of one's understanding. Applying this time honored rule, the intent of the parties throughout the critical time period in issue is obvious. The record confirms that the commitment of HUD was implemented in precisely the manner in which all parties, including the appellants herein, intended it to be.

In reviewing the instant action, one must also be mindful of the extremely close relationship that evolved between the parties over the nine-year period beginning in December of 1974, when this litigation was commenced, and the aggressive and adversary manner in which the proceedings were pursued by the appellants throughout that protracted time period, during which they demonstrated not the slightest reluctance to invoke the process of the trial court whenever they believed HUD was acting contrary to their best interests. Had appellants actually believed HUD's obligation to fund Westgate predated fiscal year 1982, reasonable minds would conclude that appellants would have placed HUD on immediate notice of its commitment to fund this area when the initial NOFA, which excluded Westgate, was issued on February 11th and 18th in fiscal year 1981 for the West Toledo and Southside Planning Districts, or at least when it became apparent that Westgate would not, or feasibly could not, be funded during the 1981 fiscal year. Despite more than ample opportunity to register any objections to the manner in which HUD was implementing its understanding of its commitment during fiscal year 1981, appellants failed to do so. The first time appellants made their understanding of the HUD responsibilities known to *anyone* was when they filed their motion for a temporary restraining order on September 29, 1982, the eve of the expiration of fiscal year 1982 and the forfeiture date of allocated funding for the seventy-

five (75) remaining units for Westgate. As a matter of fact, rather than evincing objection to HUD's action, the record reflects appellant's approval and satisfaction of HUD's action throughout fiscal years 1981 and 1982.

Apart from any suggestion that HUD was in violation of its obligation, appellants, on March 4, 1982, advised the trial court in a status report that "the availability of funds for the remaining one hundred and fifty-seven (157) units must be advertised by the end of April 1982, in order to realistically allow sufficient time for processing applications from developers by the end of the 1982 fiscal year" when the funds were released for the Westgate units. On October 1, 1981, the first day of fiscal year 1982, appellant's counsel, Paul F. Belazis, wrote defendant's counsel, John W. Herold, that:

> ... all remaining units which must be funded in fulfillment of the October 11, 1980 Stipulation [1980 Decree] will receive funding authority from 1982 appropriations.

Although defendant's conduct, considered by itself, is not conclusive evidence of the proper interpretation to be given the 1980 Decree, whether considered independently or if read *in para materia* with the 1977 Decree, the appellant's participation, acquiescence in, and ratification of such conduct, and their failure to object even when ample opportunity was afforded, belies their assertion that HUD was obligated to fund all projects in fiscal year 1981.

It is apparent from the record and the trial court's findings of fact and conclusions of law that the majority plumbs its decision on a misconception of the issue presented on appeal. On page 318 of its opinion, the majority states:

> The initial question for review is whether the appellees breached their duty under the express and implied terms of the decree. The district court properly found that the "four corners" of the 1980 decree did not provide explicit guidance on the intent of the parties. In

the face of the decree's apparent "silence," the district court implied a "reasonable time" for performance. *Citing, Bach v. Friden Calculating Machine Co.*, 155 F.2d 361 (6th Cir.1946).

In the very next sentence the majority assumes a conclusion by the trial court which the lower court did not actually make. The majority states:

> The court's implication of a "reasonable time" is supported by Section 2–309(1) of the Uniform Commercial Code. That section provides that where the parties have neglected to specify the "time for delivery," that time shall be a "reasonable time." *See also White and Summers*, Uniform Commercial Code, p. 105. This practice is appropriate in the commercial contract field because it encourages the formation of binding contracts among business entities. But this commercial law policy has little place in the field of fair housing decrees. Section 2–309, in fact, does not apply at all where the time for performance is geared toward completion of a specific project *United States Industries v. Semco*, 522 F.2d 1061 (8th Cir.), *cert. denied*, 434 U.S. 986, 98 S.Ct. 613, 54 L.Ed.2d 480 (1977).

At 318.

The Uniform Commercial Code analogy to the case at bar is the innovation of the majority that has no support either in the law or the facts of the trial court's disposition.[4]

It is conceded, as the majority concludes, that "... commercial law policy has little place in the field of fair housing decrees." The trial court never asserted to the contrary. This U.C.C. analysis was applied solely by the majority opinion. The Uniform Commercial Code is, by its express provisions, a statutory enactment directed toward achieving uniformity in state laws regulating commercial transactions. More particularly, § 2–309 of the U.C.C. by its specific language deals only with contracts for the sale of goods; the fact that specific projects are involved is irrelevant. The majority's reliance upon *United States Industries v. Semco*, 562 F.2d 1061 (8th Cir.), *cert. denied*, 434 U.S. 986, 98 S.Ct. 613, 54 L.Ed.2d 480 (1977) is equally misplaced and irrelevant.

Having attributed, by implication, an irrelevant U.C.C. section to the trial court's disposition, it is significant to note that the majority ignored completely the predicate of the trial court's actual reasoning in arriving at its decision. The true basis of the lower court's holding was the Restatement of Contracts 2d § 202(4), paired with the great weight to be given to the course of dealing between the parties during the critical two year period in issue.

Having applied the correct legal precedent to its exhaustive findings of fact, the trial court concluded, in a well-reasoned opinion, that the course of conduct and dealings between the parties reflected an understanding and intent to implement the 1980 Decree in the exact manner in which it was accomplished.

Accordingly, I would affirm the trial court's reasoning and apply a standard of reasonableness to the 1980 Decree.

But even assuming arguendo, that the majority is correct in its conclusion that the 1980 and 1977 Decrees should be read *in pari materia* for the purpose of determining HUD's obligation, and further assuming that the 1980 Decree is bound by the language of the 1977 Decree (as the majority insists), the ultimate disposition of the case is, in my opinion, not effected. I am unable to ascertain any difference between the "reasonableness" standard imposed by the trial court, and an obligation to "take all steps reasonable and necessary" which

---

**4.** The trial court actually addressed the issue thusly:

> Confining itself solely to the four corners of the 1980 Stipulation and Order, the Court finds that the relevant language is not free of ambiguity. No precise time during fiscal years 1981 and 1982 is mentioned when HUD would begin funding the units called for in paragraph four .... Thus, the Court must turn to the surrounding facts and circumstances to arrive at a proper interpretation of the words "during fiscal years 1981 and 1982."

the majority advocates as the correct standard. The trial court's approval of HUD's performance as "reasonable" under the circumstances strongly indicates that the lower court's opinion was tantamount to a conclusion that HUD *did* take "all steps necessary and reasonable" to fulfill its obligation under the 1980 Decree. Because there is no difference in the standard actually applied, and the standard insisted upon by the majority, there can be no difference in the final resolution of the dispute.

Accordingly, I would conclude that HUD had performed its obligation to appellants even if those obligations were defined by reading the 1980 Decree and the 1977 Decree together.