**IRON WORKERS LOCAL UNION NO. 17 INSURANCE FUND and its Trustees, et al., Plaintiffs,**

v.

**PHILIP MORRIS, INC., et al., Defendants.**

**No. 1:97–CV–1422.**

United States District Court, N.D. Ohio, Eastern Division.

Feb. 3, 1999.

Eben O. McNair, Timothy Joseph Gallagher, Schwarzwald & Rock, Cleveland, OH, Jack Landskroner, Monica Zunt, Landskroner Law Firm, Cleveland, OH, John M. Broaddus, Robert J. Connerton, Connerton, Ray & Simon, Washington, DC, Michael C. Spencer, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, Patrick J. Coughlin, Frank J. Janecek, Jr., Scott H. Saham, Michael J. Dowd, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, CA, Paul J. Pennock, Jerry Kristal, Mitchell M. Breit, Karen J. Sabine, Weitz & Luxenberg, New York City, Lembhard G. Howell, Richard G. Piccioni, C. Cleveland Stockmeyer, Michael E. Withey, Paul L. Stritmatter, Philip G. Arnold, Kevin Coluccio, Keith L. Kessler, J. Murray Kleist, Stritmatter, Kessler, Whelan & Withey, Seattle, WA, George Kargianis, Kargianis, Watkins, Marler, Seattle, WA, Roger M. Adelman, Washington, DC, G. Robert Blakey, Notre Dame Law School, Notre Dame, IN, Einer R. Elhauge, Harvard Law School, Cambridge, MA, Jonathan D. Rowe, Soble & Rowe, Ann Arbor, MI, for plaintiffs.

Lawrence R. Desideri, Thomas J. Frederick, Dan K. Webb, Kevin J. Narko, Bradley E. Lerman, Winston & Strawn, Chicago, IL, R. Noel Clinard, Hunton & Williams, Richmond, VA, Hugh E. McKay, Robert D. Anderle, Porter, Wright, Morris & Arthur, Cleveland, OH, Alan B. Howard, Winston & Strawn, New York City, for Philip Morris, Inc., defendant.

Roger Allen Hipp, Jones, Day, Reavis & Pogue, Cleveland, OH, Matthew A. Kairis, Jeffrey J. Jones, Melanie S. Fahey, Jones, Day, Reavis & Pogue, Columbus, OH, Daniel F. Kolb, Davis, Polk & Wardwell, New York City, for RJR Nabisco, Inc., RJR Nabisco Holdings Corp., R.J. Reynolds Tobacco Company, defendants.

Phillip J. Campanella, Calfee, Halter & Griswold, Cleveland, OH, David M. Bernick, Michelle H. Browdy, Kirkland & Ellis, Chicago, IL, Kenneth N. Bass, Paul Taylor, James C. Munson, Dawn Danzeisen Marchant, Richard Rice, Kirkland & Ellis, Washington, DC, for Brown & Williamson Tobacco Corporation, American Tobacco Company, defendants.

John Winship Read, Amanda Martinsek, Vorys, Sater, Seymour & Pease, Cleveland, OH, Gregory M. Loss, Bruce G. Sheffler, Donald I. Strauber, Chadbourne & Parke, New York City, for British American Tobacco Co., Ltd., defendant.

Percy Squire, Lloyd Pierre–Louis, Bricker & Eckler, Columbus, OH, Thomas D. Lambros, Janik & Forbes, Cleveland, OH, for B.A.T. Industries P.L.C., defendant.

Craig E. Gustafson, Gary R. Long, William J. Crampton, Bruce R. Tepekian, Gregory L. Fowler, Shook, Hardy & Bacon, Kansas City, MO, Patrick M. McLaughlin, John F. McCaffrey, McLaughlin & McCaffrey, Cleveland, OH, for Lorillard Tobacco Company, defendant.

Thomas P. Meaney, Jr., Kenneth J. Walsh, Tyler Lee Mathews, McDonald, Hopkins, Burke & Haber, Cleveland, OH, Marc E. Kasowitz, Marie V. Santacroce, Michael M. Fay, Julie R. Fischer, Marie V. Santocroce, Aaron H. Marks, Kasowitz, Benson, Torres & Friedman, New York City, for Liggett Group, Inc., defendant.

Mark S. Cheffo, Peter J. McKenna, Eric S. Sarner, Melissa A. Rule, Skadden, Arps, Slate, Meagher & Flom, New York City, Steven D. Bell, Craig A. Marvinney, Timothy J. Downing, Ulmer & Berne, Cleveland, OH,

for United States Tabacco Sales and Marketing Company, defendant.

David J. Hooker, Thomas J. Collin, Robert Francis Ware, Jr., Thompson, Hine & Flory, Cleveland, OH, Steven Klugman, Harry Zirlin, Anne E. Cohen, Debevoise & Plimpton, New York City, for Tobacco Research U.S.A., Inc., The Counsel, defendant.

Charna E. Sherman, David J. Michalski, James M. Drozdowski, Kathleen Balthrop Havener, Hahn, Loeser & Parks, Cleveland, OH, for Tobbacco Institute, Inc., defendant.

Susan V. Belanger, Arter & Hadden, Cleveland, OH, John P. Gartland, Arter & Hadden, Columbus, OH, Michael C. Lasky, Davis & Gilbert, New York City, Hill & Knowlton, Inc., for Hill & Knowlton, Inc., defendant pro se.

Timothy D. Johnson, Forrest A. Norman, III, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, OH, for Smokeless Tobacco Council, Inc., defendant.

## OPINION AND ORDER

GWIN, District Judge.

On December 28, 1998, Plaintiff Funds moved this Court for an order declaring that defendants had previously waived their claim of privilege with regard to certain documents produced in other actions or before Congress [Doc 452]. In response, defendants claim that no waiver has occurred and that such documents remain privileged. With their opposition, the defendants ask this Court to keep highly probative evidence from the factfinder when the evidence is already available to all who would merely look.

Because the moving tobacco defendants fail to sustain their burden of showing that they had not waived the privilege for tactical advantage in providing materials to the U.S. House of Representatives, and because the defendants fail to sustain their burden of showing that they had not waived the privilege for tactical advantage in settling the Minnesota state court litigation, this Court denies the defendants' motion.

### I.  Background of this action

The plaintiffs are certain trusts organized to provide health-related benefits to workers and their families.[1] The representative plaintiffs are six jointly-administered, multi-employer health and welfare trust funds in the State of Ohio. The plaintiffs make claim on behalf of themselves and a class of approximately 100 other similarly-situated health and welfare trusts, all in Ohio.[2] Both the named plaintiffs and the members of the certified class are nonprofit, tax-exempt trusts organized under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1100.01 et seq., and the Taft–Hartley Act, 29 U.S.C. § 186(c)(5).

On May 20, 1997, Plaintiff Funds brought this action against tobacco-related entities.[3] The plaintiffs allege that since about 1953, the defendants illegally shifted the large health care costs of smoking onto plaintiffs, class members, and other health care payers. Plaintiff Funds seek to recover costs incurred because of the defendants' alleged wrongful conduct. The Funds characterize their damages as economic losses arising from the "diminishment and expenditure of Fund assets" paid to provide medical treatment for tobacco-related illnesses.

To date, three (3) counts remain for adjudication. In Count I of the Amended Complaint, plaintiffs make claim under the

---

1. Plaintiffs are Iron Workers Local Union No. 17 Insurance Fund, IBEW Local No. 38 Health & Welfare Fund, Ohio Laborers' District Council–Ohio Contractors' Association Insurance Fund, Dealers–Unions Insurance Fund, Local 47 Welfare Fund No. 1, Toledo Electrical Welfare Fund and their trustees.

2. Ohio-based multi-employer trust funds, by one estimate, pay health care costs of approximately 450,000 persons. The proposed class consists of all jointly-administered, multi-employer health and welfare trusts in Ohio and their respective trustees. The trust funds serve union members in industries, such as transportation and the building trades, where a unionist might have a series of employers throughout his or her career. See Doc. 153, Affidavit of Michael E. Withey.

3. Defendants are Philip Morris, Inc.; RJR Nabisco, Inc.; RJR Nabisco Holdings Corp.; R.J. Reynolds Tobacco Co.; Brown & Williamson Tobacco Corp.; Lorillard Tobacco Co.; American Tobacco Co .; Liggett Group, Inc.; United States Tobacco Sales and Marketing Co., Inc.; and British–American Tobacco Co. Ltd. ("BATCo.").

Federal Racketeer Influenced and Corrupt Organizations Act of 1970, also known as RICO. 18 U.S.C. § 1961 *et seq.* In Count XIV, plaintiffs make claim under the Ohio equivalent of RICO, the Ohio Pattern of Corrupt Activity Act ("Ohio Corrupt Activities Act"), Ohio Rev.Code §§ 2923.31 *et seq.* In Count XI of the Amended Complaint, plaintiffs make a state law claim of civil conspiracy.

The Court has set this case for jury trial on February 22, 1999.

## II.  Discussion of confidentiality claim

### A.  Introduction

■  Plaintiff Funds move this Court for an order declaring that certain documents are not privileged. The documents involved include documents produced in certain litigation brought on behalf of the State of Minnesota and documents provided to the U.S. House of Representatives, Committee on Commerce. In requesting an order that these documents are not privileged, plaintiffs say the defendants have waived any privilege that might otherwise attend such documents.[4]

In the Minnesota tobacco litigation[5] and in Congressional inquiries, defendants in this action produced approximately 40,000 documents over which they had initially asserted a privilege or protection.[6] After Minnesota courts found the documents were not privileged, they were released to the public. Separately, the United States House of Representatives Committee on Commerce has released certain document produced to it.

These documents were placed on the Committee's Internet website.[7]

### B.  Background of release

By 1997, the State of Minnesota had brought suit against the cigarette manufacturers and certain trade associations to recover costs and certain medicaid expenditures associated with the treatment of smoking related diseases. Near the same times, Congress and the executive branch negotiated a so-called "national settlement" with cigarette manufacturers and their trade associations.

These negotiations envisioned payments by the cigarette manufacturers and passage of federal legislation that would grant defendants certain limitations and protections respecting their liability in smoking and health lawsuits. While the cigarette manufacturers negotiated with the Executive Branch and Congress, litigation continued with the State of Minnesota.

Early in 1997, a Minnesota defendant, the Liggett Group, Inc. entered into a settlement agreement with several states in their suits against the tobacco industry.[8] As part of that settlement agreement, Liggett agreed to produce certain documents to the settling states. When the Liggett Group tried to produce these documents, other cigarette manufacturer defendants objected. These non-Liggett defendants asserted privilege protection over thousands of other documents.

---

**4.**  In addition to the argument that defendants waived any attorney-client privilege, plaintiffs also claim that these documents are not privileged under the "crime-fraud" exception to privileged communication statutes or rulings. A communication is excepted from the attorney-client privilege if it is undertaken for the purpose of committing or continuing a crime or fraud. *State ex rel. Nix v. Cleveland,* 83 Ohio St.3d 379, 383, 700 N.E.2d 12 (1998). *See also United States v. Collis,* 128 F.3d 313, 321 (6th Cir.1997); *State v. Mullins,* 26 Ohio App.2d 13, 18, 268 N.E.2d 603 (4th Dist.1971) (" 'A privileged communication may be a shield of defense as to crimes already committed, but it cannot be used as a sword or weapon of offense to enable persons to carry out contemplated crimes against society.' ").

**5.**  *State of Minnesota, et al. v. Philip Morris, Inc., et al.,* No. C1–94–8565 (Minn.Dist.Ct. Mar.7, 1997) (Fitzpatrick, J.).

**6.**  The nearly 40,000 documents consist of an initial production of 864 "Liggett" documents followed by the production of approximately 39,000 other documents.

**7.**  These documents are also available for purchase on CD–ROM through the United States Government Printing Office in Washington, D.C. Defendants now say these documents remain privileged.

**8.**  The Liggett Group is a defendant in the present action and has also reached a tentative settlement agreement with the plaintiffs here.

The Minnesota court reviewed the documents to decide if the crime-fraud exception to privileged documents applied. The attorney-client privilege does not cover communications made in furtherance of a client's crime or fraud. See *U.S. v. Zolin,* 491 U.S. 554, 562–63, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989) ("It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the 'seal of secrecy,' between lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud or crime.' ") (citations omitted).

On May 9, 1997, a special master in the Minnesota court litigation recommended the defendants' claims of privilege be denied for many categories of documents. In part, the master recommended denial because of the "crime-fraud" exception.

While the Minnesota litigation continued, Congress began review of a possible nationwide tobacco settlement. In the Fall of 1997, the House Committee on Commerce began consideration of a national settlement of tobacco litigation. On November 13, 1997, Congressman Thomas Bliley of Virginia, the Chairman of the Commerce Committee, wrote to certain defendants in this action.[9] Chairman Bliley requested the defendants to produce the 864 documents identified in the report of the master in Minnesota. With this request, Chairman Bliley said the Commerce Committee was considering legislation that, if enacted, "would provide the tobacco industry with limited immunity from lawsuits."

On December 4, 1997, Chairman Bliley issued subpoenas to each of the defendants, commanding the production of the documents by noon the following day, December 5, 1997. Defendant Philip Morris complied with the subpoena and produced the documents on December 5, 1997. In producing the documents, Defendant Philip Morris was not directly ordered to produce the records at a

Commerce Committee hearing, nor did the Committee ever vote to enforce the subpoena.

On February 10, 1998, the master in the Minnesota litigation made a further recommendation suggesting defendants be ordered to produce another 39,000. These 39,000 documents had been withheld from production on privilege grounds.

After this further recommendation, Chairman Bliley again issued subpoenas to the cigarette defendants on February 19, 1995. In these subpoenas, Chairman Bliley demanded production of the additional documents identified in the special master's February 10, 1998 recommendation. The subpoena required production of the documents by March 12, 1998. In his letter demanding production, Chairman Bliley thanked the tobacco companies for "cooperation with the efforts of the Committee on Commerce to inform our Members and the American public on issues central to the proposed tobacco settlement."

After receiving Chairman Bliley's February 19, 1995 letter, the cigarette manufacturers engaged in discussions with Chairman Bliley (and/or his staff). *Commonwealth of Massachusetts v. Philip Morris, Inc.,* No. 95–7378–J, 1998 LEXIS 438, at *7–8 (Mass.Super.Ct. July 30, 1998). No clear record of these discussions exist. Despite this, it appears that Chairman Bliley deferred requiring production pending the Minnesota court's determination of defendants' claim of privilege.[10]

On March 7, 1998, the Minnesota trial judge adopted the Special Master's recommendation that the documents be produced. After the tobacco defendant unsuccessfully sought to stay production of these documents through appeal, the Minnesota courts re-

---

9. Chairman Bliley wrote to the Philip Morris Companies, Inc. RJR Nabisco, Inc., Lorillard, Inc. and Brown & Williamson Tobacco Corporation.

10. On March 12, 1998, the original due date under the subpoenas, defendants' counsel sent Chairman Bliley a letter advising him of the steps that were being taken to appeal the Minnesota

order. The letter requested "that the Committee either extend any deadline for any response to its subpoenas or refrain from issuing any ruling or direction with respect to the companies' privilege claims here until the conclusion of the Minnesota appellate process, which we hope will be an expedited one."

quired production.[11]

On April 6, 1998, the date that the United States Supreme Court declined to stay production of the documents before the Minnesota court, Chairman Bliley wrote the Minnesota tobacco defendants. He wrote:

The claim of privilege for the documents requested in the subpoenas will not be recognized. Further, unless the documents in question are produced immediately, I intend to proceed with a contempt resolution for enforcement of the subpoenas by the House of Representatives.

After consulting with the Committee's Ranking Member, Mr. Dingell, we have agreed to conduct a confidential review of the documents produced pursuant to the February 19, 1998 subpoenas to determine their suitability for release.

I urge your clients to remedy their current non-compliance status by immediately producing the subpoenaed documents.

On the same day, the defendants produced approximately 37,000 documents on CD–ROM with privilege logs, searchable indices, and a glossary of names (items not called for by the subpoenas, but clearly of great assistance to anyone seeking to review this massive production). With the documents, each of the tobacco defendants submitted its own cover letter accompanying the production.

*Commonwealth of Massachusetts*, 1998 LEXIS 438 at *11.

In these cover letters, the Minnesota tobacco defendants claimed that they produced the documents only to avoid contempt citation. For instance, in its response letter to Chairman Bliley, Defendant R .J. Reynolds again complained about the Minnesota procedure. RJR's two-page letter included the following:

While your letter of April 6, 1998 states that the Committee will not recognize the claim of privilege for the documents requested, R.J. Reynolds does not waive any claims of privilege it may have concerning these documents and are [sic] producing them, not voluntarily, but solely under the threat of contempt of Congress for non-compliance with the subpoena.

Other tobacco defendants made like responses.[12]

In producing the documents to Congress, the tobacco defendants sought no ruling by the Commerce Committee that the document production was required despite the defendants' privilege claims.

On April 22, 1998, the Commerce Committee made public nearly all of the documents that had been produced. The Commerce Committee posted them on the Internet.[13] All of the documents produced in compliance

---

**11.** After affirming the master's recommendation, the Minnesota trial judge denied the cigarette manufacturers's request for a stay pending appeal. Defendants immediately appealed the order and obtained a stay from the Minnesota Court of Appeals. On March 17, 1998, the Minnesota Court of Appeals denied defendants' petitions. Defendants then sought further review before the Minnesota Supreme Court. On March 27, 1998, the Minnesota Supreme Court denied the petitions for further review. Defendants filed a petition for writ of certiorari and an application for stay before the United States Supreme Court. The application for stay was denied on April 6, 1998.

**12.** Defendant Philip Morris' letter typifies the Minnesota tobacco defendants claimed position. It stated, in part:

By letter dated March 12, 1998, Philip Morris, along with each of the other defendants, asserted attorney-client and attorney work-product protection in response to this Committee's February 19, 1998 Congressional subpoena.

By letter dated April 6, 1998, the Committee, acting through its Chairman, rejected and overruled these claims of privilege and directed Philip Morris to produce the documents in question immediately. The Committee further made clear that failure to comply with its ruling would be treated by the Committee as a criminal contempt of the United States Congress and a that [sic] contempt solution [sic] would be pursued.

Under such circumstances, and for precisely the reasons that we were compelled to comply with the Minnesota court's order rather than stand in contempt of it, Philip Morris now has no choice but to abide the Committee's direction and make the documents available to your office for review.

*Commonwealth of Massachusetts*, 1998 LEXIS 438 at *11–12.

**13.** Initially, the Commerce Committee delayed release of approximately 400 documents. The Committee ultimately decided to release those 400 documents as well.

with the February 19, 1998 subpoena are now publicly available on the Internet.

As described, the same documents were provided in the Minnesota litigation. The Minnesota litigation settled on May 8, 1999. As part of the settlement, the parties agreed to enter into a Consent Judgment. The Consent Judgment, dated May 18, 1998, provides for dealing with public access to documents and court files. Generally, the decree seeks to make available any and all documents "for the benefit of the public and in the interest of public health."

The Consent Judgment also establishes a procedure for the dissemination of the documents. It provides:

> For documents upon which a privilege was claimed and found not to exist, including any Briefs, Memoranda, or other pleadings filed with the parties which include references to such documents, plaintiffs may seek Court approval to make such documents available to the public, provided that any such request be made to the Court within forty-five days of the entry of this Consent Judgment.

Pursuant to this procedure, the State of Minnesota sought court approval to disclose documents to the public. By order dated May 31, 1998, the Minnesota trial court released to the Minnesota depository certain non-privileged documents, including indices and privilege logs. The court reasoned these documents should be available "for the benefit of the public and in the interest of public health." The court order also released documents as to which claims of privilege had been denied or to which production was previously ordered.

Notably, in June 1998, a Minnesota chief judge reassigned the case and stayed, in part, the release and production of documents under the trial court's May 31, 1998 order. However, this stay did not address or affect the disclosure of documents admitted as trial exhibits, or those documents identified in the trial court's order that had been posted on the Internet. In this regard, the record establishes that the defendants only

sought to stay a portion of the trial court's release order, thus agreeing that the stay would not apply to trial exhibits, or to those documents posted on the Internet by Congress.

## III. Discussion

Plaintiff Funds move this Court for an order declaring that the defendants have waived their claim of privilege over certain documents produced either in previous litigation or before Congress. In support of their motion, the plaintiffs say that the defendants waived privilege when they consented to the public release of these documents when settling the Minnesota case. The Funds also say the defendants waived any claim of privilege when they voluntarily produced the documents to the House Committee on Commerce. The plaintiffs lastly say the privilege was lost by defendants' public statements and widespread disclosure of these documents.

Before deciding whether the defendants have waived the any claim or attorney-client or work-product privilege, the Court briefly discusses the law and policy attendant to privilege.

### A. The Privilege

■■■ Rule 501 of the Federal Rules of Evidence provides that "the privilege of a witness ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." See *Wolfle v. United States*, 291 U.S. 7, 12, 54 S.Ct. 279, 78 L.Ed. 617 (1934) (establishing common-law standard). The Rule is to be "construed ... to the end that the truth may be ascertained and proceedings justly determined." Fed.R.Evid. 102. In light of its truthseeking role, the Court is "disinclined to exercise [its Rule 501] authority expansively." *University of Pennsylvania v. EEOC*, 493 U.S. 182, 189, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990). To the contrary, "courts have historically been cautious about privileges." *United States v. Nixon*, 418 U.S. 683, 710 n. 18, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).[14]

---

**14.** In cases where state law claims are raised pendent to federal claims, the courts must consider choice of law. As a general rule, "in federal question cases where pendent state claims are

■ A strict construction of privileges is appropriate because "privileges obstruct the search for truth," *Branzburg v. Hayes*, 408 U.S. 665, 690 n. 29, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), and "contravene the fundamental principle that the 'public ... has a right to every [person's] evidence.'" *University of Pennsylvania*, 493 U.S. at 189, 110 S.Ct. 577 (quotation omitted).

■ Privileges "are not lightly created," *Nixon*, 418 U.S. at 710, 94 S.Ct. 3090, and "must be strictly construed." *University of Pennsylvania*, 493 U.S. at 189, 110 S.Ct. 577 (quotation omitted). A privilege applies only where it is "necessary to achieve its purpose," *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), and "promotes sufficiently important interests to outweigh the need for probative evidence." *Jaffee v. Redmond*, 518 U.S. 1, 9–10, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996) (quotation omitted).

■ Because privileges obstruct the search for truth, federal courts should be wary to find privilege except when the same is clearly shown. For these reasons, courts recognize privileges and defined their scope only to the extent established by the common law, and only to the extent that they serve a "public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth." *Id.* at 9, 116 S.Ct. 1923 (quotation omitted). In *Jaffee, supra,* the United States Supreme Court described the reasoning behind this rule:

"'For more than three centuries it has now been recognized as a fundamental maxim that the public ... has a right to every man's evidence. When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule.'" *United States v. Bryan*, 339 U.S. 323, 331, 70 S.Ct. 724, 94 L.Ed. 884 (1950) (quoting 8 J. Wigmore, Evidence § 2192, p. 64 (3rd ed.1940)). See also *United States v. Nixon*, 418 U.S. 683, 709, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Exceptions from the general rule disfavoring testimonial privileges may be justified, however, by a "'public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth.'" *Trammel [v. U.S.]*, 445 U.S., at 50 [, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980)], (quoting *Elkins v. United States*, 364 U.S. 206, 234[, 80 S.Ct. 1437, 4 L.Ed.2d 1669] (1960) (Frankfurter, J., dissenting)).

518 U.S. at 9, 116 S.Ct. 1923 (parallel citations omitted).

■ Because privileges keep relevant evidence from the fact-finder, the party making claim of an attorney-client privilege bears the burden of proving that the privilege is applicable. The privilege claimant must show not only that the privilege exists, but must also show that the privilege has not been waived.

■ The privilege is ordinarily strictly construed. Judge Carr of this Court described the narrow application of the attorney-client privilege in *United States v. Skeddle*, 989 F.Supp. 890 (N.D.Ohio 1997). He wrote:

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law," *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), but "[t]he privilege cannot stand in the

raised the federal common law of privileges should govern all claims of privilege raised in the litigation." *Hancock v. Dodson*, 958 F.2d 1367, 1372 (6th Cir.1992) (quoting *Perrignon v. Bergen Brunswig Corp.*, 77 F.R.D. 455, 459 (N.D.Cal. 1978)). "This approach appeared to be most consistent with the congressional policy that 'in nondiversity jurisdiction civil cases, federal privilege law will generally apply.'" *Id.* (citations omitted).

In Ohio, attorney-client privilege is codified at Ohio Rev.Code. § 2317.02 and is substantially

the same as federal common law. *See Whittaker v. Carmean*, 153 B.R. 985, 991–92 (Bankr. S.D.Ohio 1993). *See also von Bulow by Auersperg v. von Bulow*, 811 F.2d 136 (2nd Cir.1987) (applying federal common law of privilege under Fed.R.Evid. 501 where federal claim was based on RICO); *Wm. T. Thompson Co. v. General Nutrition Corp.*, 671 F.2d 100 (3rd Cir.1982) (same where federal antitrust claim was tried with a pendant state law claim).

face of countervailing law or strong public policy and should be strictly confined within the narrowest possible limits underlying its purpose." *United States v. Goldberger & Dubin, P.C.*, 935 F.2d 501, 504 (2nd Cir.1991). Thus, "while [s]ociety has every interest in assuring that legal advice is sought about how contemplated business transactions can be made to conform to the law ... [it], however, has no interest in facilitating the commission of contemplated but not yet committed crimes, torts, or frauds." Epstein, The Attorney–Client Privilege and the Work–Product Doctrine 251 (3rd ed.1997).[15]

*Skeddle*, 989 F.Supp. at 900 (parallel citations omitted).

■■■ The existence of the privilege and the applicability of any exception to the privilege is a question of fact for the judge. The burden of establishing the existence of the privilege rests with the party asserting the privilege. *In re Grand Jury Investigation No. 83-2-35*, 723 F.2d 447, 454 (6th Cir.1983), *cert. denied*, 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984).[16] This burden extends not only to a showing of the existence of the attorney-client relationship but to all other elements involved in the determination of the existence of the privilege. Thus, a party seeking privilege has the burden to show that (1) the communications were received from a client during the course of the client's search for legal advice from the attorney in his or her capacity as such; (2) the communications were made in confidence; and (3) the privilege as to these communications has not been waived.

A number of courts reviewing this issue have found that these tobacco defendants waived any privilege that may have attached to the documents at issue through their own disclosures and when settling the Minnesota litigation.[17] This court turns to this issue.

**B. The Minnesota Consent Judgment**

■■■ Plaintiff Funds contend that the defendants waived attorney-client and work-product privilege when they entered into the Consent Judgment dated May 18, 1998, settling the Minnesota litigation. Here, the Funds argue that the defendants did not expressly preserve any right of privilege regarding the release of the documents, and therefore "voluntarily relinquished all rights regarding document disclosure." Plaintiffs also say that the defendants agreed to allow the presiding judge, Judge Fitzpatrick, to be the final arbiter as to which documents would be released to the public.

For support, plaintiffs rely on the language contained in Section VIII(C) of the Consent Judgment. The provision states:

VIII. Public Access to Documents and Court Files

\* \* \* \* \* \*

15. In *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 635 N.E.2d 331, *cert. denied*, 513 U.S. 1059, 115 S.Ct. 668, 130 L.Ed.2d 602 (1994), the Ohio Supreme Court described the narrow application given to the attorney-client privilege:

That is to say, the mere relation of attorney and client does not raise a presumption of confidentiality of all communications made between them.... Moreover, it is beyond contradiction that the privilege does not attach in a situation where the advice sought by the client and conveyed by the attorney relates to some future unlawful or fraudulent transaction. Advice sought and rendered in this regard is not worthy of protection, and the principles upon which the attorney-client privilege is founded do not dictate otherwise.

*Id.* at 660, 635 N.E.2d 331 (citation omitted).

16. *See also Waldmann v. Waldmann*, 48 Ohio St.2d 176, 178, 358 N.E.2d 521 (1976) ("It is well-settled that the burden of showing that testi-mony sought to be excluded under the doctrine of privileged attorney-client communications rests upon the party seeking to exclude it.") (citing *In re Martin*, 141 Ohio St. 87, 103, 47 N.E.2d 388 (1943) (same)).

17. *See, e.g., Commonwealth of Massachusetts v. Philip Morris Inc., et al.*, Civ. No. 95–7378–J, 1998 LEXIS 438 (Mass.Sup.Ct. July 30, 1998); *State of Maryland v. Philip Morris, Inc., et al.*, Civ. No. 96122017 (Md.Cir.Ct. Aug. 5, 1998); *Richardson, et al., v. Philip Morris, Inc., et al.*, Civ. No. 96145050 (Md.Cir.Ct. Nov. 25, 1997); and *Cosentino v. Philip Morris, Inc., et al.*, Civ. No. MID–L–5135–97 (N.J.Sup.Ct.Octo.21, 1998). In *Falise, et al. v. American Tobacco Co., et al.*, No. CV–97–7640 (E.D.N.Y. Oct, 6, 1998), there was no question whether the documents were discoverable. Not only were plaintiffs permitted to use the materials available on the Internet, but United States Magistrate Judge Steven M. Gold ordered the defendants to produce the documents in a more easily searchable format.

(C) For documents upon which a privilege was claimed and found not to exist, including any briefs, memoranda and other pleadings filed by the parties which include reference to such documents, Plaintiffs may seek court approval to make such documents available to the public, provided that any such request be made to the Court within 45 days of the date of entry of this Consent Judgment.

Consent Judgment at 6.

Plaintiff Funds argue that by agreeing to this provision, defendants voluntarily relinquished privilege rights regarding document disclosure. Plaintiffs suggest this language contemplates the plaintiffs will seek judicial review to release the documents, and that the procedure for obtaining any such release (seeking an order from Judge Fitzpatrick) was agreeable to defendants. As such, the Funds say that the defendants agreed to have Judge Fitzpatrick be the final arbiter. The plaintiffs further contend that the Consent Judgment fails to express any right by the defendants to appeal or later challenge Judge Fitzpatrick's decisions on attorney-client or work product privilege claims.

Defendants disagree. Instead, the defendants argue the language in the Consent Judgment does not constitute a waiver, but rather gives the Minnesota plaintiffs only an opportunity to "seek court approval" to include the documents in the Minnesota depository. Defendants urge that the Consent Judgment did not grant the Minnesota plaintiffs any new right they did not already have. Defendants also urge that the Consent Judgment did not cause the defendants to relinquish any claim of privilege. Upon review of the record regarding this issue, the Court concludes that the defendants did waive the protection of privilege when they entered into the Minnesota Consent Judgment. While certain courts have found that the tobacco defendant did not waive the attorney-client privilege by entering into the Consent Judgment,[18] more courts have found a waiver. See *Gilboy v. The American Tobac-*

co Co., et al., No. 314,002, slip op. at 2 (La.Dist.Ct. Dec. 2, 1998); *State of Wisconsin v. Philip Morris, Inc., et al.*, No. 97–CV–328, slip op. at 9 (Wis.Cir.Ct. Oct. 21, 1998); *Tompkins v. R.J. Reynolds Tobacco Co.*, No. 97–CV–823, slip op. at 5 (N.D.N.Y. Oct. 21, 1998); *State of Maryland v. Philip Morris, Inc., et al.*, Civ. No. 96122017, slip op. at 18 (Md.Cir.Ct. Aug. 5, 1998). In these cases, the courts found the Consent Judgment to be clear and unambiguous, and that the decree relinquishes defendants' claims to any privileges or protections.

These court decisions are in accord with both Eighth and Sixth Circuit law (covering Minnesota and Ohio, respectively) that views consent judgments as contracts, requiring their strict construction according to their express terms. See, e.g., *Musso v. University of Minnesota*, 105 F.3d 409, 411 (8th Cir. 1997) (consent decree is construed as a contract, and because it reflects a compromise between hostile litigants, its scope must be determined within its four corners); *Mahers v. Hedgepeth*, 32 F.3d 1273, 1274–75 (8th Cir.1994) (consent decrees are construed as contracts because they have attributes of contracts); *Dotson v. U.S. Dept. of Housing and Urban Dev.*, 731 F.2d 313, 318 (6th Cir.1984) (same); *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir.1983) (same) (citing *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236 n. 10, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975)).

Minnesota law, under which the Consent Judgment was executed, turns to more elaborate principles of interpretation only when the express language of an agreement is ambiguous on its face. See, e.g., *Metropolitan Sports Facilities Comm'n. v. General Mills, Inc.*, 470 N.W.2d 118, 123 (Minn.1991); *Trondson v. Janikula*, 458 N.W.2d 679, 681 (Minn.1990); *Lamb Plumbing & Heating Co. v. Kraus–Anderson, Inc.*, 296 N.W.2d 859, 862 (Minn.1980); and *Carl Bolander & Sons, Inc. v. United Stockyards Corp.*, 298 Minn. 428, 215 N.W.2d 473, 476 (Minn.1974) (all holding that a contract is ambiguous if sus-

---

**18.** *Reed v. Philip Morris Inc.*, No. 5070–96, Hearing Tr. at 59–63 (D.C.Sup.Ct. June 25, 1998); *State of Oklahoma v. R.J. Reynolds Tobacco Co.*, No. CJ–96–1499 Hearing Tr. at 67–70 (Okla.Dist.

Ct. Oct. 20, 1998) ("I also do not find that the [Minnesota] consent judgment language waived the privilege claims").

ceptible to more than one interpretation based on its language alone).

In this instant case, the Court agrees with the plaintiffs that the documents at issue are documents to which the defendants' claimed a privilege, yet no privilege was found to exist.[19] The Court reaches this conclusion after considering the Sixth Circuit's view that consent judgments, like contracts, are to be given ordinary meaning.

In the Sixth Circuit, consent judgments are considered to be contracts susceptible to the general principles of contract interpretation. *Dotson v. U.S. Dept. of Housing and Urban Dev.*, 731 F.2d 313, 318 (6th Cir.1984).[20] In general, consent decrees have "attributes of both a contract and a judicial act." *United States v. State of Michigan*, 62 F.3d 1418 (TABLE), Nos. 94–2391, 95–1258, 1995 WL 469430, *6 (6th Cir. Aug.7, 1995) (quoting *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir.1983)).[21] As a contract, a consent decree reflects an agreement negotiated by parties who each have a purpose. *Id.* As a judicial decree, a consent judgment gives "[j]udicial approval of a settlement agreement [and] places the power and prestige of the court behind the compro-

mise struck by the parties." *Id.* (quoting *Williams*, 720 F.2d at 920).

First, the Court gives the language contained in Section VIII(C) of the Minnesota Consent Judgment its plain meaning. That section gives the plaintiffs right to seek court approval for release of those documents earlier found not to be privileged. The language proscribes that such approval will be sought from Judge Fitzpatrick. Judge Fitzpatrick, in turn, was to then decide which documents (if there were any that were not privileged) could be released to the public. The language does not provide defendants with any express right to appeal Judge Fitzpatrick's determination.

Second, the Court concludes that the Consent Judgment represents the product of extensive settlement negotiations between the parties to the Minnesota litigation. Had the defendants wished to preserve their right to raise privilege protection, or more specifically, to object to the Minnesota plaintiff's requests to release these documents. the defendants could have sought to include in the Consent Judgment express language to that effect.[22]

19. On May 31, 1998, Judge Fitzpatrick ordered the following document to be released to the public.

   a.  All non-privileged documents contained in the Minnesota depository, including 4A and 4B indices and privilege logs as provided in ¶ VII.A [of the Consent Judgment];

   b.  All documents from which claims of privilege have been stricken and/or previously ordered produced pursuant to the following Orders of the Court:

     (i) Order with Respect to Non–Liggett Defendants' Objections to the Special Master's Report Dated September 10, 1997, dated December 16, 1997 (CLAD Nos. 1821, 1835);

     (ii) Order Imposing Sanctions Upon the American Tobacco Company and Brown & Williamson Tobacco Corporation as Successor by Merger to the American Tobacco Company, dated December 30, 1997 (CLAD No.1914);

     (iii) Order with Respect to Non–Liggett Defendants' Objections to the Special Master's Report Dated February 10, 1998, dated March 7, 1998 and related Orders (CLAD Nos. 2345, 2348, 2625); and

     (iv) Order Imposing Sanctions for Failure to Comply with Order of January 5, 1998, dated March 21, 1998 (CLAD No. 2429).

Plaintiffs' Exhibit 30 at 3.

Fitzpatrick stated that release of the documents was "for the benefit of the public and in the interest of public health."

20. In *Dotson*, the Sixth Circuit described consent decrees and orders as contracts. The court stated:

    A consent decree ... is both a contract that has been negotiated by the parties and a court order which can be altered by the court if circumstances warrant.... This court has held that since consent decrees and orders have many attributes of ordinary contracts, they should be construed basically as contracts.

   *Id.* at 318.

21. In *Williams*, the Sixth Circuit described consent decrees as hybrids of contracts and judicial acts. The court said that consent judgments should be ("strictly construed to preserve the bargained for position of the parties."). *See also United States v. Armour*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971) ("[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it."); *Brown v. Neeb*, 644 F.2d 551, 557 (6th Cir.1981) (same).

22. *See Sanitary Commercial Servs., Inc. v. Shank*, 57 Ohio St.3d 178, 180–83, 566 N.E.2d 1215

Further, the Court considers the fact that this issue has been resolved favorably for the plaintiffs in other courts. See *State of Wisconsin v. Philip Morris, Inc., et al.,* No. 97–CV–328, slip op. at 9 (Wis.Cir.Ct. Oct. 21, 1998) *and State of Maryland v. Philip Morris, Inc., et al.,* No. 96122017, slip op. at 18 (Md.Cir.Ct. Aug. 5, 1998). This Court agrees with these decisions as they pertain to defendants' waiver of privilege in the Minnesota Consent Judgment.

In the *Maryland* case, Judge Roger W. Brown, of the Circuit Court for Baltimore City, found that the Consent Judgment contains "no language tending to indicate that upon application by the plaintiffs, Defendants shall or may have the opportunity to oppose such an application." *Id.* at 18. Judge Brown concluded that "[b]y entering into the Consent judgment, the Defendants waived the asserted privileges as to those documents upon which privilege was claimed and found not to exist." *Id.*

A similar conclusion was reached in the *Wisconsin* case. There, Dane County Circuit Judge Daniel Moeser also determined that the Consent Judgment lacked express language preserving or providing the defendants an opportunity to "re-litigate the privilege issue." *Id.* at 9. Judge Moeser also gave force to the negotiations of the parties as represented in the Consent Judgment. He states:

> Given that the Consent Judgment was presumably the culmination of extended negotiations between the plaintiffs and defendants, it is reasonable to enforce the clear meaning of Section VII(C) [sic] and conclude that the defendants waived their privilege with respect to those 'documents upon which a privilege was claimed and found not to exist.'

*Id.*

Applying Sixth Circuit principles of contract construction to the Consent Judgment at issue, and for the reasons outlined above, this Court concludes that defendants, by entering into the Consent Judgment dated May 18, 1998, waived the protection of privilege to those documents for which a privilege was claimed but found not to exist.

Having decided that the defendants waived the privilege by entering into the Minnesota Consent Judgment, the Court next decides whether there was a waiver when the defendants released documents to Chairman Bliley.

## C. The production to Chairman Bliley

■ Plaintiff Funds further argue that the defendants waived any right to claim attorney-client or work-product privilege when it voluntarily released the subject documents to the House Committee on Commerce. Here, the plaintiffs contend that the defendants failed to sufficiently challenge Chairman Bliley's subpoenas.

As described above, on April 6, 1998, the tobacco defendants produced to Chairman Bliley all the documents earlier produced in the Minnesota litigation. The defendants made this production without citation for contempt and without receiving a ruling from the Chair at a hearing of the Commerce Committee. Plaintiffs suggest that the defendants failure in this regard constitutes a waiver of the privilege. The Court agrees.

■ The standards employed in determining whether a party has sufficiently taken steps to contest a legislative subpoena are high. Generally, a party seeking to preserve a claimed privilege, despite Congressional subpoena, must challenge such a subpoena by standing in contempt of Congress. In *Sanders v. McClellan,* 463 F.2d 894 (D.C.Cir. 1972), the District of Columbia Court of Appeals identified certain steps to be followed when making such a challenge. The court stated:

> A witness may address his claims to the Subcommittee, which may sustain objections. Were the Subcommittee to insist, however, upon some response beyond the witness' conception of his obligation, and he refused to comply, no punitive action could be taken against him unless the full Committee obtained from the Senate as a

(1991) (stating doctrine of waiver is "applicable to all rights and privileges" and that party can waive right to appeal "when provided with the opportunity to revise the proposed language in the Settlement Agreement.").

whole a citation of the witness for contempt, the citation had been referred to the United States Attorney, and an indictment returned or information filed. Should prosecution occur, the witness' claims could then be raised before the trial court.

*Id.* at 899 (citations omitted).

In short, a party must do more than merely object to Congress' ruling. Instead, a party must risk standing in contempt of Congress. *See Sanders, supra; United States v. Bryan,* 339 U.S. 323, 333, 70 S.Ct. 724, 94 L.Ed. 884 (1950). It is fair for a court to require the witness show "that some serious effort was made to convince the Chair/and or the committee itself to recognize the privilege claims being asserted." *Commonwealth of Massachusetts,* 1998 LEXIS 438, *30.[23]

In the instant case, several factors indicate that the Minnesota tobacco defendants did not exhaust all remedies available for maintaining a claim of privilege before Chairman Bliley's committee. First, the Minnesota defendants protests to Chairman Bliley were perfunctory. In the Minnesota defendants' letter to Chairman Bliley dated March 12, 1998, the defendants complained about the Minnesota procedure and Minnesota court ruling. More important, the letter is directed to deferring production until "important appellate issues under review" are resolved. However, in the letter, the defendants make little argument directed to the merits of privilege protection, or why the privilege should continue.[24]

Perhaps more important, the record shows no real effort by defendants to challenge the order of Chairman Bliley or to seek support for such a challenge from the Commerce Committee itself. The Minnesota tobacco defendants did not record any *specific* argument to Chairman Bliley or to the Committee as a whole against the production of these documents. The record here shows no effort by the tobacco defendants to meet with Chairman Bliley or other members of the Committee.[25] The record shows no filing of a legal memorandum setting forth the bases for the privilege with the committee or statement to the committee of the factual bases for the privileges. Also, the record shows no submission of a privilege log.

Further, the record shows no request by the tobacco defendant for a hearing on their objections. See *United States v. Bryan,* 339 U.S. 323, 332–33, 70 S.Ct. 724, 94 L.Ed. 884 (1950) ("[W]e agree that respondent could rightfully have demanded attendance of a quorum of the Committee and declined to testify or to produce documents so long as a quorum was not present.... In the first place, if respondent had legitimate reasons for failing to produce the records of the association, a decent respect for the House of Representatives, by whose authority the subpoenas issued, would have required that she state her reasons for noncompliance upon the return of the writ.").

At the time the defendants produced documents to the House Committee on Commerce, the defendants were soliciting Congress and the Commerce Committee for favorable treatment in the pending global tobacco settlement. The defendants asked Congressional support for a June 1997 legislative settlement of tobacco litigation. The settlement proposal was then pending before the Bliley committee. A few weeks

---

**23.** *See also Hutcheson v. United States,* 369 U.S. 599, 618, 82 S.Ct. 1005, 8 L.Ed.2d 137 (1962) ("[I]t is not until the question is asked that the interrogator [Congress] can know whether it will be answered or will be met with some constitutional objection."); *Westinghouse Elec. Corp. v. Republic of Philippines,* 951 F.2d 1414, 1427 n. 14 (3rd Cir.1991) (requiring more than a motion to quash in order to protect against waiver of privilege); *United States v. Tobin,* 195 F.Supp. 588, 589 (D.D.C.1961) ("[H]aving failed to give the [Congressional] committee the opportunity to deal with the [privilege] issue, [defendant] may not properly assert it here.").

**24.** In a letter dated March 12, 1998, counsel for the tobacco defendants first argued that stay of the Minnesota trial court's release of the documents is "essential." Second, the letter says that the Minnesota procedures were inadequate because they were "not based upon a document-by-document review...." Third, the tobacco defendants argued that the Minnesota court erred in ruling that the crime-fraud exception to privilege applied.

**25.** Per the Committee on Commerce letterhead, there were 51 members. *See* Plaintiffs' Exhibit 24.

before receiving the subpoenas, the defendants had told the Bliley committee that it could expect their full cooperation. Plaintiffs show evidence that defendants faced choosing between thwarting the request of Congress at a time the defendants sought Congressional support for legislation these tobacco defendant wanted.

Also, when the defendants turned over documents to Chairman Bliley, they still had pending with the Minnesota court a request that the documents turned over to the Attorney General not be further disclosed. The defendants did not know whether that request would be granted, nor did they know which of the produced documents would be admitted into evidence at trial and thereby become public.[26]

As a general matter, the defendants' disclosures to Congress took place under circumstances in which the tobacco defendants were solicitous of engendering good will with Congress. The defendants had reason to satisfy Chairman Bliley's request for documents. Chairman Bliley supervised legislation, then pending, that would limit the liability of these defendants in smoking and health litigation. Congress would not likely allow this legislation to go forward without letting Congress see the defendants' documents that had been found subject to the crime-fraud exception in the Minnesota proceedings. The tobacco defendants had good reason to disclose the documents and to argue that the Minnesota litigation wrongly found a crime or fraud.

Moreover, time was of the essence. The Attorneys General lawsuits were going forward, the Minnesota trial was scheduled to start in January 1998, and delay in getting legislation through would hurt defendants' interests. The tobacco defendants had reason to produce the documents and to try to appear not to be hiding documents from Congress.

For these reasons, the Court finds that the defendants waived any claim of privilege when it disclosed and released certain documents to Chairman Bliley and the House Committee on Commerce. As related, the record gives no evidence that these defendants sufficiently exhausted or discussed with Congress the merits of their privilege claims. *See Commonwealth of Massachusetts,* 1998 LEXIS 438 at * 37.

Because this Court has decided that the defendants waived the privilege by entering into the Consent Judgment and by releasing the documents to Congress, this Court need not decide whether the defendants waived the privilege in public statements or by R.J. Reynolds' April 22, 1998 press release.

As such, the Court turns to the plaintiffs' argument for additional document production under the "same subject matter" theory.

D. "Same Subject Matter" Theory

█ Plaintiff Funds further ask this Court to "de-privilege" many documents not yet released. Here, the Funds contend the defendants have yet to release many documents that no longer are privileged. Plaintiffs say the additional documents should be made available under the "same subject matter" waiver theory.

█ Under the "same subject matter" theory, courts may except documents from privilege protection if it appears that a party in litigation has disclosed only a portion of certain privileged communications to obtain a tactical advantage in litigation. Generally, the party doing so will attempt to claim or maintain privilege over other confidential materials that are disadvantageous to their case. The "same subject matter" rule enables a court to "deprivilege" documents that have not been initially disclosed, but that otherwise relate to the same subject matter of the litigation. *In re Grand Jury Proceedings October 12, 1995,* 78 F.3d 251, 255 (6th Cir.1996). See also *United States v. Collis,* 128 F.3d 313, 320 (6th Cir.1997); *In re Sealed Case,* 877 F.2d 976, 981 (D.C.Cir. 1989).[27]

---

**26.** *See e.g.* April 6, 1998, letter of Defendant Philip Morris General Counsel Alfonso Carney, Jr.

**27.** In *In re Grand Jury Proceedings,* the Sixth Circuit instructs courts to make "prudential distinctions between what was revealed and what remains privileged." 78 F.3d at 255 (citing *In re Sealed Case,* 877 F.2d at 981). The court cau-

Although the plaintiffs in this case urge this Court to construe the "same subject matter" rule broadly, the Court is not inclined to do so at this stage of the case. Here, the Court does not find that the plaintiffs have sufficiently established what specific documents would provide the defendants with a tactical or unfair advantage in litigation.

While the plaintiff do give some evidence that the defendants were positioned to choose between thwarting a Congressional subpeona at the same time they sought Congressional support for legislation, absent more detail of these matters, the Court declines to make such a broad ruling. Absent a more specific showing, the Court denies Plaintiff Funds' request for the production of additional documents.

### IV. Conclusion

For the reasons outlined above, the Court finds that the defendants waived attorney-client or work-product privilege when they settled the Minnesota litigation. The defendants did so by entering into the Consent Judgment dated March 18, 1998. The Court also finds that the defendants waived the privilege when they released documents to Chairman Bliley and the Committee on Commerce.

Accordingly, the Court grants that part of Plantiff Funds' motion to declare privilege/protections assertions over certain documents to be waived. However, the Court denies that part of the plaintiffs' motion which seeks the production of additional documents due to "subject matter waiver."

IT IS SO ORDERED.

tions trial courts against allowing a party during trial to ask broad questions regarding privileged matters that fall within the "same subject matter" rule. The court says that trial courts "may have to determine the scope of waiver on a question-by-question basis." If so, trial courts "must be guided by fairness concerns." *Id.* at 256.