UNITED STATES of America, Plaintiff,

v.

PHILIP MORRIS INCORPORATED,
et al., Defendants.

Civil Action No. 99–2496(GK).

United States District Court,
District of Columbia.

May 17, 2002.

### *MEMORANDUM OPINION*

KESSLER, District Judge.

Plaintiff United States has moved this Court for a ruling that all Defendants waived any claims of attorney-client privilege and work product protection over approximately 39,000 documents, known as the "Bliley documents." The Government contends that the waiver resulted from two actions taken by the Defendants: (1) their production of the Bliley documents to the Commerce Committee of the House of Representatives ("Committee") without having taken all reasonable measures to safeguard the confidentiality of those documents, and (2) their consent to the public release of the documents pursuant to the settlement provisions in *State of Minnesota v. Philip Morris, Inc., et al,* No. C1–94–8565 (2nd Jud. Dist., Minn.) (the "*Minnesota* litigation"). The Government further argues that public policy considerations weigh in favor of overriding Defendants' assertions of privilege.

Despite the trial court's findings in the *Minnesota* litigation that the documents were not entitled to protection, publication of the documents by the House Committee on its internet website in April 1998, the documents' availability for purchase on CD–ROM from the U.S. Government Printing Office, and the documents' availability for public re-

view and copying at the Minnesota document depository since July 2000, Defendants[1] strongly oppose the use of such documents in this lawsuit.

The Court **grants** Plaintiff's motion because Defendants have failed to demonstrate that they did not waive their attorney-client privilege and work product protection by virtue of their production of the Bliley documents to the House Commerce Committee and their consent to the public disclosure provisions in the *Minnesota* settlement. In addition, public policy considerations strongly support use of these documents in this litigation.

### I. Background

The documents at issue first became relevant, for purposes of the present motion, when the State of Minnesota and Blue Cross and Blue Shield of Minnesota sued Defendants in 1994, seeking injunctive relief and monetary damages for expenditures for medical treatment of smoking-related diseases. *State of Minnesota v. Philip Morris, Inc., et al,* No. C1–94–8565 (2nd Jud. Dist., Minn.); *see also State of Minnesota v. Philip Morris, Inc.,* 606 N.W.2d 676, 680–85 (Minn.Ct.App. 2000) (detailed history of *Minnesota* litigation). During the pendency of this lawsuit, while many others were pending in both state and federal courts, Congress became involved in the process of negotiating a nationwide tobacco settlement.

In early 1997, a *Minnesota* defendant (who is a Defendant in this case), the Liggett Group, Inc. ("Liggett"), entered into a settlement with several states in their suits against the tobacco industry. Pursuant to that agreement, Liggett agreed to produce certain tobacco industry documents. The non-Liggett defendants objected strenuously to the production of such documents, claiming they were privileged or otherwise protected from disclosure.

On September 10, 1997, a Special Master appointed by the *Minnesota* trial court de-

---

**1.** Defendants joining in the opposition brief are Lorillard Tobacco Company, Philip Morris Incorporated, R.J. Reynolds Tobacco Company, Brown & Williamson Tobacco Corporation (individually and as successor by merger to American Tobacco Corporation), The Council For Tobacco Research–USA, Inc., and The Tobacco Institute, Inc.

termined that 864 documents were not privileged or were subject to the crime-fraud exception to the attorney-client privilege. *See* Report and Recommendations of September 10, 1997 (Pl.Ex. 3). The Report was adopted by the *Minnesota* trial court on December 16, 1997, over the objections of the non-Liggett defendants. *See Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris, Inc., et al,* 35 F.Supp.2d 582, 587 (N.D.Ohio 1999).

On November 13, 1997, Congressman Thomas Bliley, Chairman of the House Commerce Committee, wrote to certain defendants in the *Minnesota* litigation,[2] requesting that they voluntarily produce the 864 documents identified in the *Minnesota* Special Master's Report. *See id.* After being rebuffed, the Committee finally subpoenaed the 864 Liggett documents on December 4, 1997. Philip Morris produced the documents the following day. Two weeks later, on December 18, 1997, the Committee released the documents to the public and press via the internet. *See id.* Before producing the documents, Defendant Philip Morris did not obtain a ruling from Chairman Bliley on the privilege claims, nor did it ever obtain a Committee vote to enforce the subpoena.

On February 10, 1998, the *Minnesota* Special Master made a further recommendation for release of additional documents. He determined that approximately 39,000[3] of a total of 230,000 documents were not privileged or were subject to the crime-fraud exception. *See* Report and Recommendations of February 10, 1998 (Pl.Ex. 4); *Minnesota,* 606 N.W.2d at 682.

Nine days after issuance of the Special Master's Report, Chairman Bliley again issued subpoenas to certain tobacco companies involved in the *Minnesota* litigation. The subpoenas required production by March 12, 1998, of all documents for which the Special Master had "recommended that the claim of privilege should not be maintained."[4] Pl.Ex. 6.

On March 7, 1998, the *Minnesota* trial court adopted the Special Master's Report and Recommendations, ordered that the documents be produced within forty-eight hours, and denied defendants' request for a stay pending appeal. *State of Minnesota v. Philip Morris, Inc.,* No. C1–94–8565, 1998 WL 257214 (Minn.Dist.Ct. Mar.7, 1998). On March 12, 1998, the return date of the Committee subpoenas, the subpoenaed companies jointly submitted a letter to Chairman Bliley informing him that they had appealed the trial court's ruling and that the appellate court had stayed the trial court's order of production pending defendants' appeals (the "March 12 letter"). *See* Pl.Ex. 7 (Letter of March 12, 1998 from Meyer Koplow to Chairman Bliley). In their March 12 letter, the companies outlined alleged procedural deficiencies in the way the *Minnesota* court handled the privilege claims, appended copies of their briefs to the *Minnesota* appellate court, and requested that the Committee refrain from issuing any ruling with respect to their privilege claims until conclusion of the appellate process in Minnesota. *See id.*

The companies' efforts to overturn the *Minnesota* order were unsuccessful. On March 17, 1998, the Minnesota Court of Appeals denied their petitions, and on March 27, 1998, the Minnesota Supreme Court denied the petitions for further review. *See State of Minnesota v. Philip Morris, Inc.,* Nos. CX–98414, –98431, 1998 WL 154543 (Minn. Mar.27, 1998). On April 6, 1998, the U.S. Supreme Court denied the companies' final application for a stay of the *Minnesota* order. *See Philip Morris, Inc. v. Minnesota,* 523 U.S. 1056, 118 S.Ct. 1384, 140 L.Ed.2d 643 (1998).

On the same day the Supreme Court ruled, Chairman Bliley requested immediate production of the documents and announced that privilege assertions over them would not be

---

**2.** Chairman Bliley wrote to the Philip Morris Companies, Inc.; RJR Nabisco, Inc.; Lorrilard, Inc.; and Brown & Williamson Tobacco Corporation.

**3.** Approximately 37,000 documents were produced by domestic Defendants and 2,000 were produced by British Defendants (BATCo and BAT Industries).

**4.** The Committee did not subpoena, or ultimately post on the internet, the 2,000 documents produced by the British Defendants.

recognized. *See* Pl.Ex. 9 (Letter of April 6, 1998, from Chairman Bliley to Meyer Koplow). Later that day, the domestic defendants in the *Minnesota* litigation produced the 37,000 subpoenaed documents with privilege logs. In letters accompanying the production, those defendants stated that they maintained their claims of attorney-client privilege and work product protection and urged against public dissemination of the documents. *See* Pl.Ex. 10 (Letter of April 6, 1998, from Brennan Dawson to Chairman Bliley); Pl.Ex. 11 (Letter of April 6, 1998, from Alfonso Carney to Chairman Bliley); Pl.Ex. 12 (Letter of April 6, 1998, from James Goold to Chairman Bliley). Before producing the documents, the companies sought no ruling by the Committee as a whole that the document production was required despite submission of their privilege claims. On April 22, 1998, the Committee posted on its internet website the 37,000 documents produced on April 6, as it had done earlier with the 864 Liggett documents. All documents have been and remain publicly available on the internet.

The following month, the *Minnesota* parties reached a settlement, and the court entered a consent judgment on May 19, 1998. Included in the consent judgment was language permitting the plaintiffs in that litigation to seek court approval to make public those documents for which a privilege had been claimed but had been found by the Special Master not to exist. As anticipated, the *Minnesota* plaintiffs sought to lift the protective orders covering the documents and make them available to the public. On November 25, 1998, the *Minnesota* trial court granted the plaintiffs' request and ordered public release of the documents. As a result, the Bliley documents have been available for public review and copying at the Minnesota document depository since July 2000.

## II. The Attorney–Client Privilege and Work Product Doctrine

■ The attorney-client privilege is one of the oldest recognized privileges in the common law. Its purpose is to encourage full and frank communication between attorneys

and their clients. *See Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Despite this vital interest, the privilege is narrowly construed by the D.C. Circuit because of its adverse effects on the full disclosure of truth. *See S.E.C. v. Lavin*, 111 F.3d 921, 929 (D.C.Cir. 1997). In addition, the D.C. Circuit "adheres to a strict rule on waiver of privileges," placing the burden of protecting privileged communications squarely on the proponent of the privilege. *See id.* To preserve the privilege, the holder must "zealously protect the privileged materials, taking all reasonable steps to protect their disclosure." *Id.; see also In re Sealed Case*, 877 F.2d 976, 980 (D.C.Cir. 1989).

■ The work product doctrine provides immunity from discovery for written materials that are prepared by a lawyer in anticipation of litigation. Its purpose is to shelter the mental processes of the attorney, providing a privileged arena in which to analyze and prepare the client's case. *See United States v. Nobles*, 422 U.S. 225, 238, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975). Disclosing work product to anyone "without common interests in developing legal theories and analyses of documents" serves as a waiver of the protection. *See In re Sealed Case*, 676 F.2d 793, 817 (D.C.Cir.1982).

■ It is well-established that the party asserting attorney-client privilege and work product protection bears the burden of proving that the privilege exists and that the privilege has not been waived. *See In re Lindsey*, 148 F.3d 1100, 1106 (D.C.Cir.1998). Thus, in the context of the present Motion, the burden of proof is on the Defendants to prove that they have not waived the privilege, not on the Government to establish that Defendants did waive it.

## III. Analysis

### A. Disclosure to Congress

■ The United States argues that Defendants waived the attorney-client privilege and work product protection over the Bliley Documents by releasing them to Congress without making all reasonable efforts to preserve their confidentiality. Defendants con-

tend that the production to Congress was involuntary, and therefore did not waive the claim of privilege.

Defendants devote a significant portion of their opposition brief (and attached affidavits) to the argument that they "had no right to 'appeal' the Chairman's ruling short of being convicted of criminal contempt." Defs.' Memo. in Opp'n to Pl.'s Mot. for Ruling that Defs. Have Waived Their Claims of Att'y–Client Privilege and Work Product Protection Over the Bliley Docs. at 9 ("Defs.' Memo"). However, that argument misses the mark because the United States is not contending that Defendants should have stood in contempt or that they failed to employ a particular recourse subsequent to the Chairman's ruling.

Rather, Plaintiff argues that Defendants failed to make "efforts 'reasonably designed' to protect and preserve the privilege," *Lavin*, 111 F.3d at 930, *prior* to Chairman Bliley's ruling on the privilege claims and concurrent warning of contempt resolution proceedings. With respect to the 864 Liggett documents, the Chairman never even ruled on the privilege claims before the Defendants turned them over.[5] With respect to the 37,000 documents, the relevant inquiry is whether Defendants made sufficient effort to protect their confidentiality prior to April 6, 1998, the date the Chairman wrote Defendants informing them that the privilege would not be recognized and threatening to proceed with a contempt resolution.

As noted, Defendants bear the burden of establishing that the privilege has not been waived. Although there is no checklist of procedural steps that automatically guarantees preservation of the privilege, in this instance Defendants' limited efforts to preserve the privilege prior to production were clearly insufficient.

With respect to the 864 Liggett documents, Defendants produced the documents ·

the day after the subpoenas were issued. Yet, there is no evidence in the record that the Chairman or the Committee refused to recognize the privilege claims or that the subpoenas would be enforced. Indeed, Defendants did not even obtain a ruling from Chairman Bliley regarding the privilege claims. *See Massachusetts v. Philip Morris, Inc., et al.,* No. 957378J, 1998 WL 1248003, at \*2 (Mass.Super.Ct. July 30, 1998). Neither had they been directly ordered to produce the documents at a Committee hearing. *See Iron Workers,* 35 F.Supp.2d at 587. Moreover, the Committee had not voted to and never did vote to enforce the subpoena. *See id.*

Indeed, the only action Defendants did take with regard to the 864 Liggett documents prior to their production, was to state in their cover letters that they were producing the documents because they had been "informed that the Committee will overrule any assertion of privilege with respect to this group of documents because of the ruling in Minnesota that these documents are not privileged." *See Massachusetts,* 1998 WL 1248003, at \*2. As addressed above, such unofficial conversations with unidentified members of Chairman Bliley's staff deserve little weight. Accordingly, such a cursory explanation of the reason for compliance is insufficient to carry Defendants' burden of proving that they made all reasonable efforts to protect and preserve the privilege.

Prior to production of the 37,000 Bliley documents produced on April 6, 1998, the only evidence in the record of steps taken to challenge the subpoena is the March 12 letter sent to Chairman Bliley. The March 12 letter advised the Chairman of the efforts to appeal the *Minnesota* order. A significant portion of the letter is devoted to the alleged procedural deficiencies in the way the Special Master and trial judge handled Defendants' privilege claims. Defendants made little ar-

---

**5.** Defendants claim that, during unspecified conversations, they were advised by unidentified persons on Chairman's Bliley's staff that the Committee had decided to overrule Defendants' assertion of privilege and would seek to initiate criminal contempt proceedings if the documents were not produced. *See* Parrish Affidavit at ¶¶ 4–6, Def. Ex. 5. Plaintiff is correct that there is

no merit to Defendants' assertion that such conclusory, nonspecific statements about informal conversations with unidentified staff people constitute rulings from the Committee Chair. *See Commonwealth of Massachusetts v. Philip Morris, Inc. et al,* No. 957378J, 1998 WL 1248003, at \*2 (Mass.Super.Ct. July 30, 1998).

gument in the letter regarding the substantive merits of their privilege claims or why the privilege should remain intact. Neither did Defendants submit a privilege log at that time. Defendants did not even request that the Chairman or Committee sustain Defendants' objections or withdraw the subpoenas. Instead, the letter merely requested that the Committee either extend the deadline for response to the subpoenas or refrain from issuing any ruling with respect to the privilege claims until conclusion of the Minnesota appellate process.[6] This Court agrees with the ruling in *Iron Workers* that the March 12 letter is insufficient to constitute a "serious effort . . . to convince the Chair/and or the committee itself to recognize the privilege claims being asserted." *Iron Workers*, 35 F.Supp.2d at 595; *see also Massachusetts*, 1998 WL 1248003, at *9.

Significantly, during the seven-week period between issuance of the subpoenas and Chairman Bliley's ruling that the privilege would not be recognized, the record shows no effort by Defendants to meet with Chairman Bliley or other members of the Committee. *See Massachusetts*, 1998 WL 1248003, at *10; *Iron Workers*, 35 F.Supp.2d at 595; *Haines v. Liggett Group, Inc., et al*, No. 84–678, slip. op. at 17 (D.N.J. Oct. 15, 2000) (Pl.Ex. 8). Neither did Defendants request a hearing on their objections or an opportunity to submit arguments on the merits of the privilege claims to the Committee as a whole or to individual members of the Committee. *See Iron Workers*, 35 F.Supp.2d at 595; *Haines*,

slip op. at 17; *Massachusetts*, 1998 WL 1248003, at *10. Moreover, there is no evidence that Defendants made any effort to obtain a ruling from the full Committee that the privilege claims were overruled and that production was required. *See Haines*, slip op. at 13.[7]

Defendants' failure to make more than a minimal effort to convince the Chairman and the Committee to recognize their privilege claims is particularly telling given that Defendants and their attorneys were highly knowledgeable and experienced in dealing with Congress. *See Massachusetts*, 1998 WL 1248003, at *10. Indeed, Defendants' meager efforts in opposing the production to Congress is in stark contrast to the extensive efforts they employed to preserve the privilege in the *Minnesota* litigation. Furthermore, one would expect more than minimal effort to protect the privilege given the likelihood that the Committee would post the 37,000 documents on the internet just as it had promptly posted the previously submitted 864 Liggett documents.

In sum, Defendants have failed to meet their burden of establishing that they took all reasonable measures to safeguard the confidentiality of the Bliley documents prior to producing them to the House Commerce Committee. Therefore, the Defendants have waived any claims of attorney-client privilege or work product protection over the documents.[8]

**6.** Subsequent to the Chairman's ruling, Defendants submitted cover letters with the document production asserting that they maintained their claims of privilege and urging against public dissemination of the documents. At that time, Defendants finally submitted privilege logs. Defendants' submission is inadequate to meet their burden. First, the cover letters and privilege logs were submitted *after* the Chairman's ruling, and therefore cannot constitute an effort to convince the Chair to recognize the privilege. *See Massachusetts*, 1998 WL 1248003, at *2. Second, in light of the steps Defendants did not take to preserve the privilege, discussed *infra*, the arguments in the cover letters are insufficient to avoid waiver.

**7.** Indeed, Defendants could not have been held in contempt " 'unless the full Committee obtained from the [chamber of Congress] as a whole a citation of the witness for con-

tempt. . . .' " *Haines*, slip op. at 12 (quoting *Sanders v. McClellan*, 463 F.2d 894, 899 (D.C.Cir. 1972)).

**8.** For those courts ruling that Defendants waived the privilege by producing the documents to Congress, see *Iron Workers*, 35 F.Supp.2d at 594–97; *Haines*, slip op. at 10–18; *Tompkins v. R.J. Reynolds Tobacco Co.*, 92 F.Supp.2d 70, 77–78 (N.D.N.Y.2000); *Massachusetts*, 1998 WL 1248003, at *12. While the Court recognizes that other courts have found the Defendants' actions sufficient to preserve the privilege, those conclusions were set forth in either brief one-page orders or in opinions whose reasoning this Court does not find persuasive. *See I.O.U.E. v. Philip Morris, Inc., et al.*, No. 3:97–0708, 1999 U.S. Dist. Lexis 21097, slip op. at 5–7 (S.D.W.Va. June 18, 1999) (Def.Ex. 12); *Scott v. American Tobacco Co.*, No. 96–8461 (Dist. Ct. Orleans Parish, La), 4/30/01 Hearing Tr. at 11–13 (Def.Ex.

## B. *Minnesota* Consent Judgment

■ The United States further contends that, in addition to the waiver resulting from production to Congress, Defendants waived attorney-client privilege and work product protection over the Bliley documents by consenting to their release in the *Minnesota* Settlement Agreement and Stipulation for Entry of Consent Judgment ("Consent Judgment"). Plaintiff argues that Defendants voluntarily relinquished their rights regarding public document disclosure by agreeing that the *Minnesota* trial court would be the final arbiter of which documents would be released to the public and by failing to include language in the Consent Judgment preserving their right to oppose the *Minnesota* plaintiffs' application for release of those documents.

■ It is well-established that consent decrees are agreements between parties to litigation and are generally construed as contracts. *See United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236–237, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975). Like a contract, a consent decree or order must therefore be construed "within its four corners." *United States v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971); *see Richardson v. Edwards*, 127 F.3d 97, 101 (D.C.Cir.1997). Accordingly, this Court interprets the *Minnesota* Consent Judgement pursuant to its terms.

Section VIII(C) of the Consent Judgment provides that "[f]or documents upon which a privilege was claimed and found not to exist ... Plaintiffs may seek court approval to make such documents available to the public, provided that any such request be made to the Court within 45 days of the date of entry of this Consent Judgment." Pl.Ex. 16, at 6.

Thus, the text of the Consent Judgment unambiguously provides the *Minnesota* plaintiffs with a mechanism to seek approval from the Minnesota trial court to release the documents to the public and affords the trial court complete authority to decide the matter. Interestingly, there is no express corresponding provision by which the *Minnesota* defendants reserve the right to oppose plaintiffs' application for public disclosure. Nor is there any express provision by which the *Minnesota* defendants reserve their right to appeal the trial court's decision.

Defendants contend that the Consent Judgment merely preserved the *status quo* by permitting the *Minnesota* plaintiffs to "seek court approval" to include the documents in the Minnesota depository. Defendants urge the Court to interpret the Consent Judgment's silence about their right to object "as preserving—not eliminating—the *Minnesota* defendants' pre-existing right to oppose any motion to lift the protective order, for the simple reason that the *Minnesota* defendants never expressly agreed to give it up." Defs.' Memo. at 24. The express language contained in Section VIII(C) of the Consent Judgment does not support Defendants' contention. This Court is not persuaded by Defendants' suggestion that their right to object was so obvious that no explicit preservation provision was required.

First, as one court has noted, "[i]t could similarly be argued that plaintiffs' right to move for the release of the documents was obvious, but, it is important to note, that right was specifically provided for in the Consent Decree." *Falise v. American Tobacco Co., et al.*, 193 F.R.D. 73, 80 (E.D.N.Y. 2000).

Second, the Consent Judgment represents the culmination of extensive settlement nego-

13); *State of Wisconsin v. Philip Morris*, No. 97–CV–328, slip op. at 7 (Cir. Ct., Dane City, Wis. Oct. 21, 1998) (Pl.Ex. 14); *Burton v. R.J. Reynolds*, No. 94–2202–JWL (D.Kans. July 19, 2000), Teleconference Tr. at 11–20 (Def.Ex. 14); *In re Tobacco Cases II*, No. JCCP–4042, slip op. at 1–2 (Super.Ct., San Diego County, Cal. Aug 9, 1999) (Def.Ex. 15); *Huffman v. American Tobacco Co.*, No. 98–C–276, slip op. at 3 (13th Jud. Cir., Kanawha City, W. Va. Aug. 4, 1999) (Def.Ex. 16); *State of Maryland v. Philip Morris, Inc.*, No. 96122017, slip op. at 9, 12 (Cir. Ct., Baltimore City, Md. Aug 5, 1998) (Def.Ex. 17); *State of Washington v. American Tobacco Co.*, No. 96–2–15056–8, slip op. at 2 (Super.Ct., King County, Wash. March 1, 1999) (Def.Ex. 18); *State of Missouri ex rel. Nixon v. American Brands, Inc.*, No. 972–1465 (Cir. Ct. 22nd Jud. Dist., St. Louis City, Mo. Aug. 15, 1998), Hearing Tr. at 3 (Def.Ex. 19). The *Maryland* and *Wisconsin* courts, however, found that Defendants did waive the privilege through the *Minnesota* Consent Judgment.

tiations between the *Minnesota* parties, all of whom were represented by experienced lawyers. Despite their pre-existing right to move for public release of the documents, the *Minnesota* Plaintiffs bargained for express preservation of their right to do so. Consequently, Defendants' failure to also bargain for the express preservation of their right to oppose public disclosure constitutes a waiver of the privilege as to those documents.[9]

Indeed, other courts considering the issue have also concluded that Defendants waived the privilege over the Bliley documents by consenting to their public release in the *Minnesota* Consent Judgement. *See Falise*, 193 F.R.D. at 80–81; *Tompkins*, 92 F.Supp.2d at 76–77; *Iron Workers*, 35 F.Supp.2d at 591–94; *State of Maryland v. Philip Morris, Inc. et al.*, No. 96122017, slip op. at 17–19 (Cir. Ct., Baltimore City, Md. Aug. 5, 1998) (Def.Ex. 17); *State of Wisconsin v. Philip Morris, et al.*, No. 97–CV–328, slip op. at 8–9 (Wis. Cir. Ct., Branch 11, Dane County, Oct.21, 1998) (Pl.Ex. 14).[10]

Accordingly, the Court concludes that, because the express terms of the settlement agreement fail to preserve the *Minnesota* defendants' right to oppose public release of the Bliley documents and afford the trial court complete authority to decide the matter, Defendants waived any privilege claims for those documents.

## C. Public Policy Considerations

■ The United States further contends that, in addition to Defendants' waiver through production of the documents to the Committee and through consent to their public release in the *Minnesota* settlement, important public policy considerations weigh in favor of overcoming claims of attorney-client privilege and work product protection for the Bliley documents. The Court agrees.

First and foremost, it must simply be recognized that the Bliley cat is out of the bag and cannot be stuffed back in. These documents have been widely disseminated and are readily available to the public not only throughout the United States, but worldwide. As previously noted, the documents are posted on the House Commerce Committee's internet website, are available for purchase on CD–ROM from the U.S. Government Printing Office, and are available for public review and copying at the Minnesota document depository. Furthermore, the documents have been the subject of extensive press releases and news stories. *See Falise*, 193 F.R.D. at 82.

Because of this widespread disclosure, the public policy basis for maintaining their confidentiality has been eliminated. The fundamental purpose of the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). The policy behind work product protection is to shield an attorney's mental processes in evaluating and preparing a client's case in light of the realities of litigation in the adversarial system. *See United States. v. Nobles*, 422 U.S. 225, 238, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975). Given the public availability of the documents, any interference with or diminution of candid attorney-client communications has already occurred. Further, Plaintiff's current access to the publicly available documents renders the work product protection ineffectual. *See Falise*, 193 F.R.D. at 82–83. Indeed, "[a]ny effort to apply the privilege now would be tantamount to instructing the *New York Times* to 'unpublish' the Pentagon Papers." *Richardson, et al. v. Philip Morris, Inc., et al*, No. 96145050, slip op. at 4 (Md.Cir.Ct. Nov. 25, 1997) (Pl.Ex. 18).

---

9. The fact that the *Minnesota* defendants did, in fact, oppose the plaintiffs' application to release the documents, does not alter the Court's analysis. A consent decree is to be construed as written, according to its terms. The language of the Consent Judgment is clear on its face, and the express terms do not preserve the *Minnesota* defendants' right to oppose public release of the Bliley documents.

10. Again, the Court is aware that other courts have reached contrary conclusions, but is not persuaded by their reasoning. *See I.O.U.E.*, slip op. at 4–5; *In re Tobacco Cases II*, slip op. at 2; *Huffman*, slip op. at 3; *Haines*, slip op. at 20. The *Haines* court did, however, determine that Defendants waived the privilege through production of the documents to Congress.

Moreover, there is a strong public policy reason for disclosing these documents in this case. Cases against the tobacco industry—and this case is clearly the most massive of the many filed—raise significant public health issues that have broad economic and social ramifications. Public officials involved in cases against the industry have described the central role played by the Bliley documents and the detailed picture they provide of the tobacco industry's activities. *See Falise*, 193 F.R.D. at 83 (quoting Minnesota Attorney General Hubert H. Humphrey: "These internal documents provide devastating proof that the tobacco lawyers and scientists conspired to . . . conceal the truth from the American public.").

The present case involves sweeping allegations by the federal government that Defendants have engaged in a pattern of racketeering activity comprised of more than 100 predicate acts spanning more than a half-century. It would be anomalous if the general public were permitted unfettered access to the Bliley documents, yet they could not be used in this lawsuit. That result would be particularly unjustified given that the public policy basis for maintaining the documents' confidentiality has already been eliminated by their widespread disclosure. As one court has said:

> In light of the public attention that will doubtlessly be given to these cases, as well as the availability of these documents to the general public, a trial at which these plainly critical documents are unavailable to the finder of fact could seriously undermine the public's confidence in the integrity of the court's process. Indeed, it would understandably be difficult for the public to accept a verdict where the finder of fact did not have access to documents that have been characterized by public officials as "clearly a smoking howitzer."

*Id.* at 84.

In sum, the Court concludes that, in addition to Defendants' waiver of the privilege, policy considerations weigh in favor of overriding Defendants' claims of attorney-client privilege and work product protection for the Bliley documents.

## IV. Conclusion

For the foregoing reasons, Plaintiff's motion to declare not privileged the 39,000 documents produced to Chairman Bliley and publicly released pursuant to the *Minnesota* settlement is **granted.**[11]

**11.** The Court is not purporting to rule at this time on any other objections which may be raised as to the use of these documents.